Judge Marion F. Edwards, Pro Tempore
I,An Orleans Parish jury convicted Kenneth “Bud” Jones, as charged, of two counts of attempted second degree murder and one count of being a felon in possession of a firearm, resulting from a drive-by shooting. The trial judge sentenced him to twenty-five years on each count of attempted second degree murder, and twenty years on the remaining count. After Mr. Jones admitted his status as a second felony offender, the trial judge vacated the previous sentences and resentenced him to one hundred years on each count of attempted second degree murder and twenty years on the felon in possession of a firearm count.
Mr. Jones now appeals and raises six assignments of error pertaining to his convictions and one assignment of error in relation to his sentences. After reviewing his arguments, the record, and applicable law, we affirm the defendant’s convictions and sentences. We explain our decision in greater detail below.
I
We begin with a recitation of the facts in this case, as adduced by the prosecution at trial, as well as the relevant procedural history.
I2A
In 2009, concerned with an increase in drug-related violence, the Federal Bureau of Investigation (“FBI”) launched the Ninth Ward Initiative, a joint task force comprised of various federal and local law enforcement agencies, including the Bureau, the New Orleans Police Department (“NOPD”), and the Louisiana State Police. Over the course of its investigation, the FBI identified two rival groups from the Lower Ninth Ward, the Back of Town and the Park Boys, which were primarily responsible for the drug trade and related violence in the area. The victims in this case, Merlin Smothers and Jeremiah Harris, are associated with the Park Boys, and the defendant, Kenneth “Bud” Jones, is associated with Back of Town.
On November 22, 2011, Merlin[1] and Mr. Harris were driving in New Orleans when a blue Monte Carlo pulled up behind them and an individual standing through the sunroof began shooting at them with an assault rifle. Mr. Harris was shot in the neck but survived; Merlin was unharmed. The Monte Carlo was spotted at the scene and attempted to flee from police. After a brief chase, the Monte Carlo crashed and police apprehended the driver, Eugene Brashears, who was the only person in the vehicle at that time.[2] Police collected two red hats from the car but did not find a gun. The driver was not charged as the shooter.
| ^Although both Merlin and Mr. Harris gave statements to NOPD investigators that the shooter was a black male with a red hat, neither identified the shooter to police and no suspect was arrested at that time.
The FBI subsequently arrested Merlin and Mr. Harris in the course of a drug trafficking investigation. In an apparent attempt to curry favor with federal prose *132 cutors, both men identified “Bud,” the defendant, as the shooter on November 22, 2011. Merlin disavowed those statements at the defendant’s trial, claiming he never implicated Mr. Jones as the shooter in this or any other crime. Mr. Harris maintained that his statements to the FBI were correct and that Mr. Jones was the person who shot him.
On December 2, 2011, the NOPD conducted aerial and ground surveillance on the defendant’s associates in the hopes of locating Mr. Jones. In the course of surveillance, NOPD officers identified from aerial recordings a person who they believed to be the defendant, riding with another person in a white Dodge pickup truck. Officers followed the truck, and observed an occupant hastily exit the vehicle carrying what appeared to be an assault rifle. Investigators subsequently retrieved a discarded AK-47 from the area. Forensic testing revealed Mr. Jones to be the major contributor of DNA material on the firearm and ballistics testing confirmed that the casings found were fired from the recovered AK-47.[3]
A grand jury indicted Mr. Jones for two counts of attempted second degree murder and one count of possession of a firearm as a convicted felon.
_|¿J3
Mr. Jones raises seven assignments of error in this appeal. First, he claims the trial judge erred by overruling a Batson[4] challenge lodged by the defense. Relatedly, he claims that the trial judge erred by sustaining the prosecution’s reverse Bat-son challenge. Third, Mr. Jones alleges that the failure to record eighteen bench conferences violates his constitutional rights to a complete appellate record. Next, he argues that the trial court erred by allowing the prosecution to introduce prejudicial other crimes evidence. Fifth, he claims that the evidence was insufficient to support his convictions. Sixth, Mr. Jones claims the prosecutor’s remarks in closing argument, which referenced the lack of a confession, violated his constitutional right against self-incrimination. Finally, the defendant argues that his concurrent 100-year sentences are constitutionally excessive.
We address each assignment of error in the Parts that follow.
II
In this Part, we begin by addressing Mr. Jones’s sufficiency of evidence claim. See State v. Marcantel, 00-1629 (La. 4/3/02), 815 So.2d 50, 55 (“When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, we first determine the sufficiency of the evidence.”) (citing State v. Hearold, 603 So.2d 731, 734 (La. 1992)).
JfiA
The standard of review for sufficiency of evidence applicable to criminal convictions is set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The inquiry requires a reviewing court to determine “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson, 443 U.S. at 319, 99 S.Ct. 2781.
*133 There are several key principles to a sufficiency review. First, we examine all the evidence considered by the jury, including evidence which may have been erroneously admitted. See Hearold, 603 So.2d at 734. Second, all the evidence is viewed in the light most favorable to the prosecution. See Jackson, 443 U.S. at 319, 99 S.Ct. 2781; State v. Clements, 15-0630, p. 7 (La.App. 4 Cir. 5/4/16), 194 So.3d 712, 717. Thus, we may consider all reasonable inferences from the evidence which the fact-finder could have made. See id.
Finally, as a reviewing court, we are highly deferential to the findings of the trier of fact. See Jackson, 443 U.S. at 319, 99 S.Ct. 2781; State v. Armstead, 14-0036, p. 11 (La.App. 4 Cir. 1/28/15), 159 So.3d 502, 512. A jury may accept as true the testimony of any witness, even a single witness, and find such testimony sufficient to establish each essential element beyond a reasonable doubt. See Clements, at p. 7, 194 So.3d at 717. And, we will only tread on a jury’s presumed acceptance of a witness’s testimony when that testimony is implausible or clearly contrary to the evidence. See State v. Mussall, 523 So.2d 1305, 1311 (La.1988); Armstead, at p. 12, 159 So.3d at 512. See also State v. Macon, 06-481, p. 8 (La. 6/1/07), 957 So.2d 1280, 1285 (“A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the Jackson standard of review.”).
B
Mr. Jones was convicted of two counts of attempted second degree murder and one count of being a felon in possession of a firearm. The prosecution had to therefore prove that Mr. Jones had the specific intent to kill the victims, demonstrated by commission of an overt act that tends toward the accomplishment of the victims’ death. See La. R.S. 14:30.1; La. R.S. 14:27. Additionally, the prosecution had to prove that Mr. Jones 1) possessed a firearm; 2) was previously convicted of an enumerated felony; 3) possessed the firearm within ten years of the previous conviction; and 4) had the general intent to commit the crime. See La. R.S. 14:95.1; State v. Scott, 13-0321, p. 8 (La.App. 4 Cir. 2/26/14), 136 So.3d 383, 389.
C
Construing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could conclude that Mr. Jones was guilty beyond a reasonable doubt of two counts of attempted second degree murder and of being a felon in possession of a firearm.
1
Jeremiah Harris testified that in 2013, he entered into a plea bargain with federal authorities, pleading guilty to distribution of heroin and conspiracy to |7distribute heroin in exchange for leniency during sentencing. He testified that the “No. 1 rule” of the plea bargain was that he “tell the truth, nothing but the truth” at trial. Mr. Harris stated that if he was not truthful about this incident (and others), the plea bargain would be void.
Mr. Harris testified that when the shooting started on November 22, 2011, he turned to look behind him and saw “Bud” standing outside of the sunroof of a car firing at them with an AK-47. He described Mr. Jones as wearing a red hat and stated that he was “100 percent sure” that the defendant was the shooter. Mr. Harris stated there was nothing obstructing his view of Mr. Jones. He admitted that he had been drinking cough syrup to get high only a short time prior, but denied that it had impaired his ability to identify his shooter. Mr. Harris testified that he did not reveal the defendant’s iden *134 tity when questioned by the NOPD because he wanted to retaliate against Bud without police involvement. He stated that Merlin was also aware Mr. Jones was the perpetrator.
The prosecution presented evidence that Back of Town and Park Boys were engaged in a long-running deadly feud. It likewise demonstrated that Mr. Jones aligns with Back of Town, while the victims align with Park Boys. Further, the evidence showed that Mr. Jones had attempted to kill Merlin in a prior incident and had warned Mr. Harris to “watch who you are around.” Coupled with the defendant’s act of shooting an AK-47 several times into the victims’ vehicle, we find that the prosecution presented sufficient evidence of specific intent to kill and demonstrated an overt act in furtherance of the victim’s death.
|sMr. Jones cites Merlin’s trial testimony, wherein he denied identifying the defendant as the shooter to the FBI, to support his argument that the evidence is insufficient. Two FBI agents, however, Agent Christopher DiMenna and Agent Crystal Bender, testified that Merlin implicated Mr. Jones as the shooter in this incident, in addition to several others. Agent DiMenna also testified that he took a statement from Mr. Harris implicating the defendant as the shooter. As noted above, witness testimony will be upheld unless it is implausible or clearly contrary to the evidence. See Mussall, 523 So.2d at 1311; Armstead, at p. 12, 159 So.3d at 512. Clearly, the jury found Mr. Harris’s testimony and the testimony of the FBI agents more credible than that of Merlin Smothers. We see no reason to disturb this finding.
2
As to the conviction for possession of a firearm by a convicted felon, the defense stipulated that Mr. Jones had a prior felony conviction for possession of cocaine in 2008, which is an enumerated offense under the statute and well within the ten-year cleansing period. See La. R.S. 14:95.1 A. Thus, the prosecution only needed to prove that Mr. Jones possessed the firearm. See State v. Gaubert, 15-0774, p. 9 (La.App. 4 Cir. 12/9/15), 179 So.3d 982, 988-89 (“In general intent crimes, criminal intent necessary to sustain a conviction is shown by the very doing of the acts which have been declared criminal.”) (internal quotation marks omitted) (citing State v. Oliphant, 12-1176, p. 12 (La. 3/19/13), 113 So.3d 165, 172).
|flThe evidence at trial revealed that on December 2, 2011, the NOPD conducted an aerial and ground surveillance operation in an attempt to locate Mr. Jones. A person matching the defendant’s description was seen riding in a white Dodge pickup with one other person. Based on the recorded aerial surveillance, the two subjects then ran from the vehicle carrying what appeared to be an assault rifle. NOPD subsequently recovered an AK-47 from the area. Forensic testing revealed Mr. Jones as the major contributor of DNA on the firearm, with a one in 10.5 quintillion[5] probability that the DNA came from a person other than the defendant. Moreover, ballistics analysis matched the casings recovered from the scene to the firearm with Mr. Jones’s DNA.
Mr. Jones points out that no one, law enforcement or otherwise, positively identified him as being present or carrying an assault rifle on December 2nd. He also cites testimony given by Jonathan Alexander, an associate of Mr. Jones and a mem *135 ber of Back of Town, where Mr. Alexander testified that he was in possession of the firearm that day, and that it belonged not to the defendant, but to his friend Chris Williams, who is now deceased. He further testified that Mr. Jones was not present with him that day. On cross-examination, Mr. Alexander admitted that, at the time of trial, he was charged with second degree murder and that he and Mr. Jones were housed in the same tier at Orleans Parish Prison.
We acknowledge that Mr. Jones was not definitively identified as having actually possessed the recovered AK-47 on December 2, 2011. We find, however, |inthe fact that his DNA was found on the firearm as the major contributor, and that the same firearm was linked to the instant shooting where he was identified as the perpetrator, is sufficient to satisfy the essential element of possession.
Ill
We turn now to address the defendant’s Batson claims.
A
Following voir dire of the first jury panel, the defense raised a Batson challenge, based on the prosecutor’s use of peremptory challenges to strike “thus far four African-Americans out of five” from the jury pool. The following colloquy then occurred:
The Court: What is your response?
Mr. Napoli [prosecutor]: My first response would be that there is two African-Americans that we are going to keep on the Jury. The second response would be that of all the cuts used by Defense counsel, they are all on white Jurors. The third response, as to Ms. Hills, Judge, is that, first, she is an educator and is—I had some concern when I asked her about her prior Jury service. First she didn’t say anything, and then she couldn’t give us any details about the type of crime, when it took place or anything like that.”
The Court: I will note for the record that of the five challenges the State has exercised, one of them is a white male. So, per se, it is not satisfied and I accept the State’s response as to the challenge, in addition to that.
Mr. Daniels [defense counsel]: Note our objection.
Following voir dire of the second panel, the prosecutor raised a “reverse-Batson ” challenge, based on the defense’s use of all ten peremptory challenges to strike white prospective jurors. See State v. Nelson, 10-1724, p. 8 (La. 3/13/12), 85 So.3d 21, 28 (“[T]he state may invoke Batson where a black criminal defendant exercises peremptory challenges against white prospective jurors.”). The trial judge then stated “I’m noting that the State has satisfied that first level, they are all |nwhite.” The judge also noted that a majority of the stricken prospective jurors had left; she thus asked the defense to provide reasons for striking the remaining three, Jurors Feigel, Luke, and Laughlin. Mr. Jones complains only about Mr. Feigel on appeal. The following colloquy occurred between defense counsel and the trial judge:
Mr. Daniels: I’m striking Mr. Eiegel, Your Honor, because Mr. Fiegel didn’t talk much and I think Mr. Washington didn’t really question him that much. The only thing I know about him is that he is a disc jockey at a radio station. I don’t know what kind of radio station that is, Through our error, we didn’t ask him any—-we didn’t get a feel for—one way or another, I struck him because he wasn’t very talkative.
$ ⅜ ⅜
The Court: You have satisfied your race neutral basis for Jurors Luke and *136 Laughlin. I am not satisfied with your response as to Mr. Fiegel. Batson challenge is granted as to Juror No. 28, Mr. Fiegel. He is part of this Jury.
B
Mr. Jones first claims that at the time he lodged his Batson challenge, the trial judge erred by failing to require the prosecution to submit race-neutral reasons after implicitly finding that the defense made a prima facie showing. Specifically, he argues that because the trial judge asked the prosecutor for a response, a prima facie case had been established. As to the prosecutor’s Batson challenge, Mr. Jones claims that the trial judge erred by improperly shifting the burden to the defense rather than keeping it with the proponent of the strike, the prosecution.
Under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a violation of the Equal Protection Clause occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of that person’s race. See also La. C.Cr.P. art. 795. A Batson analysis involves three steps. First, the party raising the challenge must make a prima facie case of racial discrimination, which is established when three 112elements are shown: 1) the challenge was directed at a member of a cognizable group; 2) the challenge was peremptory rather than for cause; and 8) there are circumstances sufficient to raise an inference that the prospective juror was struck on account of race. See Batson, 476 U.S. at 96, 106 S.Ct. 1712; see also State v. Williams, 13-0283, p. 16 (La.App. 4 Cir. 9/7/16), 199 So.3d 1222, 1232.
If a prima facie showing is made, the burden shifts to the proponent of the strike to articulate a race-neutral explanation for the challenge. See Foster v. Chatman, 578 U.S. -, -, 136 S.Ct. 1737, 1747, 195 L.Ed.2d 1 (2016) (citing Snyder v. Louisiana, 552 U.S. 472, 476-77, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008)). Third, in light of the parties’ submissions, the trial court must then determine if the opponent of the strike has carried the burden of showing purposeful discrimination. See id.; Nelson, 10-1724, at p. 9, 85 So.3d at 29.
1
With regard to Mr. Jones’s first claim, it is true that the Louisiana Supreme Court has held that when a trial judge demands that a prosecutor justify his use of peremptory strikes with race-neutral reasons, that is tantamount to making a prima facie finding under step one of Batson. See State v. Green, 94-0887, pp. 24-25 (La. 5/22/95), 655 So.2d 272, 288. We note, however, the trial judge did not specifically ask the prosecutor to justify his use of peremptory strikes, nor did she state that she wanted race-neutral reasons. Furthermore, when the trial judge’s statement “per se, it is not satisfied” strongly suggests she did not find that the defense had established a prima facie case of racial discrimination, especially because she prefaced this statement by noting that the prosecutor’s peremptory | ^challenges were not entirely directed at African-Americans. ‘When the district court finds the defendant failed to establish a prima facie case of discrimination (step one), the Bat-son analysis terminates; the burden of production ‘never shifts to the prosecutor to articulate neutral reasons (step two).’” Williams, at p. 25, 199 So.3d at 1238-39. And, we are not convinced that the trial judge’s request for a response from the prosecutor, while perhaps not keeping within the confines of a Batson analysis, constituted a demand for race-neutral reasons such that the burden would shift to the state. Cf. State v. Bender, 13-1794, pp. *137 3-4 (La. 9/3/14), 152 So.3d 126, 129 (“[T]he District Court asked the State to articulate race-neutral reasons for its challenged peremptory strikes....”); Green, at p. 24, 655 So.2d at 288 (“[The trial court] immediately moved to the second step and ordered the prosecutor to justify his use of peremptory strikes against black prospective jurors with race-neutral reasons.”).
2
As to the prosecutor’s Batson challenge, it is clear that the trial judge found that the prosecution established a prima facie case by her statement “the State has satisfied that first level....” The judge then proceeded to step two of the Batson analysis by asking defense counsel to provide race-neutral reasons as to Juror Fiegel. We note that the reasons provided by the defense, as quoted above, were facially race-neutral. See Nelson, 10-1724, at p. 11, 85 So.3d at 30 (“Unless a discriminatory intent is inherent in the striking party’s explanation, the reason |14offered will be deemed race-neutral.”) (citing Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)).
Step three of the Batson analysis requires the trial judge “to assess the plausibility of [the proponent’s] reason in light of all evidence with a bearing on it.” Miller-El v. Dretke, 545 U.S. 231, 251-52, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). In determining whether the party objecting to the strike has shown purposeful discrimination, we acknowledge that “the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.” State v. Harris, 15-0995, p. 4 (La. 10/19/16), 217 So.3d 255, -, 2016 WL 6123605 (quoting Purkett, 514 U.S. at 768, 115 S.Ct. 1769). We also note that the denial of a peremptory challenge does not always implicate constitutional rights, and in cases where the jury is ultimately composed of qualified and unbiased individuals, automatic reversal will not necessarily be required. See Rivera v. Illinois, 556 U.S. 148, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009). And, because a trial court’s determination of whether discriminatory intent is present rests largely on credibility determinations, its factual findings are entitled to great deference by the reviewing court. See State v. Jacobs, 99-0991, p. 4 (La. 5/15/01), 803 So.2d 933, 938 (citing Batson, 476 U.S. at 98, n. 21, 106 S.Ct. 1712).
The trial judge’s succinct statement that she was “not satisfied” with defense counsel’s reasons may appear to have imper-missibly shifted the burden onto the defense to rebut the prosecutor’s prima facie case. We are convinced, however, that the trial judge “assessed] the plausibility of [the defense’s] reason in light of all [the] evidence,” and, in essence, determined that the prosecution had carried its | ¿burden. Miller-El, 545 U.S. at 251-52, 125 S.Ct. 2317. Although the trial judge may not have adhered to the precise mechanics of a Batson analysis, we find that her ultimate ruling, which seated Juror Fiegel, did not render the jury unqualified or biased. We thus cannot say, based on the record before us, that the circumstances presented here warrant automatic reversal of Mr. Jones’s convictions. See Rivera, 556 U.S. at 160, 129 S.Ct. 1446 (An error is “structural,” therefore requiring automatic reversal “only when the error necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.”) (internal quotation marks and brackets omitted).[6]
*138 IV
In this Part, we turn to address the defendant’s Prieur claims.
A
The prosecution filed a pre-trialPrieur[7] Notice, seeking to introduce evidence of Mr. Jones’s gang affiliation, specifically, evidence that Mr. Jones was the perpetrator in four other drive-by shootings in 2011, all committed with an assault rifle where members of the Park Boys were intended targets. Mr. Jones was neither convicted nor arrested in connection with the shootings. After a pretrial hearing at which Agent DiMenna testified, the trial judge ruled the evidence admissible to show Mr. Jones’s intent, motive, preparation, plan, and opportunity |1Band found it would assist the jury in understanding the background and complexities of the case.
B
Here, we summarize the other crimes evidence presented at trial:

May 2011 Incident

Detective Matthew White testified that he responded to a complaint of gunshots fired at Bonart Park in the Ninth Ward on May 24, 2011. Det. White received information that the perpetrator was driving a green Toyota Camry, which had fled the scene. The shell casings found at the scene were determined to be a caliber used with an AK-47 assault rifle.
FBI Agent James Ollinger testified that he interviewed Kendrick Smothers, a victim of a gang-related shooting and also an associate of Back of Town. According to Agent Ollinger, Kendrick had a verbal altercation with a member of the Park Boys, Peter Santiago, on May 24, 2011. Mr. Santiago ended the altercation by telling Kendrick he would “be waiting at the park for you armed with an AK.” Kendrick then contacted the defendant, relayed the altercation, and told him to go to Bonart Park and shoot Mr. Santiago. Agent Ollinger testified that Kendrick confirmed that Mr. Jones did fire shots into the park and was also driving a green Toyota Camry at the time.
When Kendrick Smothers testified, he admitted that Mr. Jones was his close childhood friend and that he and Peter Santiago did have a verbal altercation on |17May 24th. He denied, however, telling Agent Ollinger that he had told Mr. Jones to shoot up the park and that Mr. Jones was driving a green Toyota Camry.

May 27, 2011 Incident

Det. Kurt Coulon testified that on May 27, 2011, he responded to a shooting in the Lower Ninth Ward. The victim, Corey Cel-estine, had been shot twice. Det. Coulon testified that Mr. Celestine was not cooperative and would not relay any information about the shooter to police. He also testified that 31 shell casings from an AK-47 were retrieved at the scene.
Agent DiMenna later testified that the FBI targeted Devin Morgan because he was a member of the Park Boys but was also close with Back of Town members and thus likely to have information on both gangs. When Mr. Morgan was arrested for distributing heroin, Agent DiMenna took a statement from him wherein he identified the defendant as a member of Back of *139 Town and the shooter of Corey Celestine on May 27, 2011. Mr. Morgan told the agent he was “certain” he saw Mr. Jones hanging out of the window of a car shooting an assault rifle.
Devin Morgan testified and the FBI investigated him for drug-related offenses in 2012. The prosecutor elicited testimony indicating that Mr. Morgan was a member of the Park Boys. Mr. Morgan denied, however, giving a statement to the FBI in which he identified the defendant as the perpetrator in the shooting of Corey Cel-estine. He likewise denied that he identified members of Back of Town, including Kenneth Jones, to FBI agents. When asked by the prosecutor if the FBI agent who took his statement was lying, Mr. Morgan responded in the affirmative.

\jgSeptember 5, 2011 Incident

NOPD Officer Jonathan Parker testified that on September 5, 2011, he responded to an aggravated battery by shooting. When he arrived on the scene he observed a vehicle riddled with bullets and several shell casings on the ground. The officer identified the eighteen casings as having come from an assault rifle. Officer Parker spoke to one of the victims, Merlin Smothers, who had been shot several times and was at the hospital. Merlin identified the car his assailant was driving—a blue Monte Carlo with a sunroof—but did not provide any information to NOPD about the shooter.
Merlin testified that he was shot several times on September 5, 2011 by a person in a blue Monte Carlo. He admitted being arrested by the FBI and giving two separate interviews to federal agents in 2013. Merlin denied telling the FBI that on September 5, 2011, Kenneth Jones stood out of the sunroof of a blue Monte Carlo and shot at him with an assault rifle. He also denied stating that the defendant was the only one who would “do something to him.”
Agent Crystal Bender testified that she was present for two interviews with Merlin Smothers and that both times he identified the defendant as the person who shot him on September 5, 2011. Agent DiMenna, who was present only for the second interview, likewise testified that Merlin stated “Bud” shot him while standing up through the sunroof of a blue Monte Carlo. Both agents testified that Merlin provided details about the shooting, including the location, the possible reason he was targeted, and that the defendant was wearing a red hat.

|i^November-29, 2011 Incident 

[8]

On November 29, 2011, multiple assailants fired shots from a white Dodge pickup truck into a Ninth Ward bar known to be frequented by Park Boys. Police recovered several assault rifle shell casings from the area. Agent Bender testified that Merlin Smothers told her the defendant was one of the shooters. When Merlin testified at trial, though, he denied making those statements to the FBI and denied identifying any perpetrators of the bar shooting.
C
Mr. Jones asserts on appeal that the other crimes evidence was erroneously admitted' because 1) the state failed to prove that Mr. Jones committed the offenses at the pre-trial hearing; 2) the trial court should have reconsidered its admissibility ruling when new information after the pre-trial hearing revealed that the prospective witnesses, Merlin Smothers and Devin Morgan, had recanted their statements implicating Mr. Jones in the shootings; and 3) the prejudicial effect of the evidence outweighed its probative value.
*140 The general rule in Louisiana is that evidence of other crimes, wrongs, or acts is not admissible to prove the accused committed the charged crime because he has committed such crimes in the past or to show that the probability that he committed the crimes because he is a person of criminal character. See State v. Garcia, 09-1578, p. 53 (La. 11/16/12), 108 So.3d 1, 38; see also La. C.E. art. 404 A.
The seminal case governing other crimes evidence, Prieur, has recently been abrogated by the Louisiana Supreme Court’s opinion in State v. Taylor, 16-1124, 16-1183 (La. 12/1/16), 217 So.3d 283, 2016 WL 7030750. The court reaffirmed the majority of principles set forth in Prieur and its progeny and reiterated that La. C.E. art. 404 B(1) governs the admissibility of other crimes, wrongs, or acts, provided that the prosecution establishes an independent reason for its admission, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. And, even when the evidence is offered for a purpose allowed under Article 404 B(1), the evidence must have substantial relevance independent from showing the accused’s criminal character and is not admissible unless it tends to prove a material fact at issue or to rebut a defendant’s defense. See Taylor, at p. 12, — So.3d at —, 2016 WL 7030750, at p. 7. The prosecution must still provide written notice before trial that it intends to offer prior crimes evidence, and the requirement that the court charge the jury as to the limited purpose of the evidence remains intact. See id. (citing Garcia, at p. 54, 108 So.3d at 39). The trial court as gatekeeper must continue to balance the probative value of the other crimes evidence against its inherently prejudicial effect before the evidence can be admitted. See id. (citing State v. Henderson, 12-2422, p. 2 (La. 1/4/13), 107 So.3d 566, 567-68); see also La. C.E. art. 403.
Taylor emphasized that a pre-trial hearing on admissibility is required. The court further clarified the prosecution’s burden of proof at the pre-trial hearing: “[W]hen seeking to introduce evidence pursuant to La. C.E. art. 404 (B), the state need only make a showing of sufficient evidence to support a finding that the defendant committed the other crime, wrong, or act.” Taylor, at p. 10, — So.3d at —, 2016 WL 7030750, at p. 6 (emphasis in original). Taylor declined to require a specific type of evidence, stating that the sufficiency of testimony or |⅞1 documents, such as a police report or conviction, must be determined on a case-by-case basis. See id., at p. 12, — So.3d at —, 2016 WL 7030750, at p. 6.
Finally, a trial court’s determination of the admissibility of other crimes evidence will not be reversed absent an abuse of discretion. See State v. Copelin, 16-0264, p. 17 (La.App. 4 Cir. 12/7/16), 206 So.3d 990.
D
In its Notice, the prosecution sought to introduce evidence of Mr. Jones’s gang affiliation, which would in turn reveal his intent, motive, preparation, plan, identity, and opportunity. The prosecution’s theory of the case at trial was that Mr. Jones attempted to kill two members of a rival gang which had a long and reciprocal history of violence with the defendant’s gang. Evidence of gang affiliation may be relevant and admissible to show motive, identity, and intent. See, e.g., State v. Gray, 14-1213, pp. 9-11 (La.App. 4 Cir. 11/25/15), 179 So.3d 936, 941-42. Additionally, specific intent is an essential element of the crime of attempted second degree murder. See La. R.S. 14:30.1 A(1); La. R.S. 14:27 A. And, because Mr. Jones’s *141 defense at trial appeared to be that he was not the perpetrator, his identity and motive had substantial independent relevance to this case. We thus find that the evidence was submitted for a valid purpose other than to show Mr. Jones’s criminal character. See La. C.E. art. 404 B(1).
At the pre-trial hearing, FBI Agent Christopher DiMenna testified that in the course of the Ninth Ward Initiative investigation, Mr. Jones had been developed as a suspect in the four other incidents, as well as the instant incident. Agent DiMen-na testified in detail about the multiple witnesses who identified Mr. Jones as the shooter in each incident. He further testified about how police | ^recovered the discarded AK-47 and that forensic and ballistic testing linked the gun to the defendant and two of the crime scenes, respectively.
We first find that, under Taylor, the prosecution carried its burden with a “showing of sufficient evidence to support a finding” that Mr. Jones committed the other acts. Agent DiMenna testified that he and his team conducted investigations into each of these shootings and that either he or his colleagues obtained statements from witnesses who identified Mr. Jones as the shooter. Although the defendant complains that Agent DiMenna’s testimony was hearsay, it is well-established that hearsay is admissible in a pre-trial hearing on the admissibility of other crimes. See Taylor, at pp. 13-14, — So.3d at —, 2016 WL 7030750, at p. 7; State v. Scales, 93-2003, pp. 2-3 (La. 5/22/95), 655 So.2d 1326, 1329-30; see also La. C.E. art. 104 A.
As to whether the trial judge should have reconsidered her ruling when the prosecution revealed that Devin Morgan and Merlin Smothers had recanted their prior statements to law enforcement, we find no support for Mr. Jones’s position. Taylor allows for more relaxed evidentiary standards at the pre-trial hearing, but noted that the prosecution “will obviously be required to adhere to the rules of evidence when presenting evidence... at trial. . ..[and] [s]hould the state not properly present competent evidence at trial, the trial court may exclude the other crimes evidence at that time.” Taylor, at p. 15, — So.3d at —, 2016 WL 7030750, at p. 8. Thus, the substance of the prospective witnesses’ trial testimony had no bearing on the pre-trial admissibility of the evidence, especially because neither Merlin nor Mr. Morgan testified at the pre-trial hearing. In light of the recantations, the state perhaps bore a heavier burden to properly present evidence of the witnesses’ statements at trial. Nevertheless, we agree with the trial court l^that the issue of recantations went to the weight of the evidence, not its admissibility.
Finally, we do not find that the prejudicial effect of the other crimes evidence outweighed its probative value. While we do recognize that a substantial portion of the trial was dedicated to four other shootings, we also recognize that many witnesses who had previously implicated the defendant in statements to law enforcement proved uncooperative at Mr. Jones’s trial. The prosecution, in order to properly present the other crimes evidence within the rules of evidence, was forced to call additional witnesses to rebut the testimony of the now-recanting witnesses. See generally State v. Collins, 01-1459, p. 23 (La. App. 4 Cir. 8/21/02), 826 So.2d 598, 613 (“If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by testimony of a person to whom the statement was made, and the statement can be given substantive effect.”) (internal quotation marks and citation omitted). Moreover, the trial judge instructed the jury as to the limited pur *142 pose for the introduction of other crimes evidence and, as noted above, the evidence presented as to the charged offenses was constitutionally sufficient to convict Mr. Jones. See State v. Campbell, 15-0017, pp. 27-28 (La.App. 4 Cir. 6/24/15), 171 So.3d 1176,1192.
Consequently, we find that the trial judge did not abuse her discretion by ruling the other crimes evidence admissible in this case.
V
In this Part, we address Mr. Jones’s claims of prosecutorial misconduct and the lack of an adequate record on appeal.
A
1 ^Mr. Jones claims that in closing argument, the prosecutor referenced Mr. Jones’s failure to confess, which violated his Fifth Amendment right against self-incrimination and warranted a mistrial.
In his closing argument, the prosecutor recounted the evidence which the state had presented at trial, including testimonial, DNA, and ballistics. He then stated, “One thing we weren’t able to bring you-all was a confession, but during my closing argument I’m going to confess a number of things to each and every one of you.”
1
La.C.Cr.P. art. 774 provides that the scope of closing argument “shall be confined to the evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.” Closing argument “shall not appeal to prejudice,” and the prosecution’s rebuttal argument “shall be confined to answering the argument of the defendant.” Id. While prosecutors may not refer to personal experience or turn their argument into a plebiscite on crime, prosecutors nonetheless have “wide latitude in choosing closing argument tactics.” See State v. Casey, 99-0023, p. 17 (La. 1/26/00), 775 So.2d 1022, 1036 (citing cases); State v. Jones, 10-0018, p. 9 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 833. And, even if a prosecutor exceeds the scope of proper argument, a reviewing court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. Id.
In relevant part, a mistrial shall be ordered upon motion of a defendant when the prosecutor, during closing argument, refers to “[t]he failure of the defendant to testify in his own defense.” La. C.Cr.P. art. 770(3). If the prosecutor makes a | ^remark outside the scope of Article 770, trial judge may order a mistrial, upon the request of the defendant, when the remark is of such a nature that it might create prejudice against the defendant and an admonition is not sufficient to assure a fair trial. See La. C.Cr.P. art. 771.
The record reveals that Mr. Jones neither lodged an objection to the prosecutor’s remarks nor moved for a mistrial. See La. C.Cr.P. art. 841 A. Thus, he is not entitled to a mistrial under La. C.Cr.P. arts. 770 or 771. Moreover, although we note that the prosecutor’s reference to the lack of a confession was unnecessary when emphasizing the strength of the state’s case, we are not “thoroughly convinced” that the statement influenced the jury and contributed to the verdict.
B
Mr. Jones next claims that the failure to record eighteen bench conferences precludes adequate appellate review.
1
The Louisiana Constitution guarantees a criminal defendant the right to *143 judicial review “based upon a complete record of all evidence upon which the judgment is based.” La. Const. art. 1, § 19. Additionally, La. C.Cr.P. art. 843 requires all proceedings to be recorded, “including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.” Unlike material omissions in the record, however, a “slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal” will not require reversal. State v. Campbell, 06-0286, p. 99 (La. 5/21/08), 983 So.2d 810, 872 (citation omitted).
|2flWe note that there is no per se rule either requiring the recording of bench conferences or exempting them under La. C.Cr.P. art. 843. See State v. Hoffman, 98-3118, p. 49 (La. 4/11/00), 768 So.2d 542, 586. Moreover, “objections” and “arguments” under Article 843 normally only apply to objections made in open court and the arguments of counsel at closing, “because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843.” Id. And, the “evidence” referred to in La. Const. art. 1, § 19 does not generally encompass bench conferences unless they satisfy the materiality requirements of Article 843. Id.
2
In an effort to demonstrate materiality, Mr. Jones points to two instances of unrecorded bench conferences which he claims prejudiced his right to appeal. Both instances concern statements during trial which allegedly insinuate that Mr. Jones orchestrated the murder of Eugene Brash-ears, the driver of the Monte Carlo on November 22, 2011. See n. 2, ante. Both times defense counsel asked to approach, and an unrecorded bench conference was held.
The first exchange occurred during opening statements:
Mr. Napoli: There is one guy you are not going to hear from and that is Eugene Brashears, the driver of that car. My first thought when we finally were able to bring these charges in 2014, let’s go talk to Eugene. It wasn’t just my first thought, though. You-all remember the name of that guy who was picked up in the car out on December 2, 2011, Julius Alexander—
Mr. Daniels: Your Honor, may we approach?
At that point an unrecorded bench conference was held. The prosecutor then resumed his opening remarks:
Mr. Napoli: ... Obviously Kenneth Jones was in jail when that murder was committed. What is very clear, Ladies and Gentlemen, is all of [a] sudden, I adjust after July 2014, there was a reason to kill Eugene Brashears, there was a reason to silence him.
The second instance occurred during the testimony of FBI Agent DiMenna:
Mr. Napoli: .. .August 30th of 2014?
Agent DiMenna: 2014, yes. Yes.
Mr. Napoli: Is that the date that Eugene Brashears was murdered?
Agent DiMenna: Yes. Yes. That reminds me now because it was a little over a month after we had charged Mr. Jones in the case that is before us.
Mr. Napoli: So it was a month after Kenneth Jones was charged with this attempted murder on November 22nd?
Defense counsel then requested to approach, and an unrecorded bench conference was held.
We first note that Mr. Jones admits he did not object to the unrecorded *144 bench conferences, and the record is void of any request by defense counsel to record the sidebars. See La. C.Cr.P. art. 841; State v. Johnson, 09-0259, p. 12 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 213 (failure to object to unrecorded bench conferences did not preserve issues for appeal). He nonetheless argues that because the substance of the conferences is unknown, and thus might be material to his appeal, this court should reverse his convictions and order a new trial. Absent a showing of specific prejudice or that the unrecorded conferences had a discernible impact on the proceedings, however, a defendant will not be entitled to relief because of an incomplete record. See Hoffman, at p. 50, 768 So.2d at 587 (citing State v. Castleberry, 98-1388, pp. 28-29 (La. 4/13/99), 758 So.2d 749). Mr. Jones asks us to presume that the unrecorded conferences contain material objections or motions for mistrials. We do not find that argument persuasive, especially considering that defense counsel requested the sidebars and saw fit not 128to object on the record. We further find that the current record, despite eighteen unrecorded bench conferences, is sufficient to afford Mr. Jones his constitutional right to appellate review.
VI
In his final assignment of error, Mr. Jones claims his concurrent 100-year sentences as a second felony offender are unconstitutionally excessive.[9]
A
The Louisiana Constitution prohibits sentences which constitute “cruel, excessive, or unusual punishment.” La. Const. art. 1, § 20. And, a sentence, although within the statutory range, may nonetheless violate a defendant’s right against excessive punishment. See State v. Brandy, 16-0263, p. 9 (La.App. 4 Cir. 8/24/16), 198 So.3d 1247, 1255 (citation omitted). This rule applies likewise to sentences imposed under the Habitual Offender Law. See State v. Dorthey, 623 So.2d 1276 (La. 1993). A sentence is constitutionally excessive if it is grossly disproportionate to the severity of the offense and is nothing more than the needless imposition of pain and suffering. See State v. Bonanno, 384 So.2d 355, 357 (La. 1980).
The penalties provided by the legislature, however, reflect the degree to which criminal conduct is an affront to society. See State v. Weaver, 01-0467, p. 12 (La. 1/15/02), 805 So.2d 166, 174. Moreover, sentences imposed under the Habitual Offender Law are presumed constitutional. See State v. Johnson, 97-1906 (La. 3/4/98), 709 So.2d 672, 675 (citing Dorthey, 623 So.2d at 1281). Thus, | ^imposed sentences which fall within the statutory range should be given great deference by a reviewing court. See id.
B
As noted, Mr. Jones was convicted of two counts of attempted second degree murder. The trial judge initially imposed the maximum of two 50-year sentences to run concurrently. See La. R.S. 14:30.1 B; La. R.S. 14:27 D(1)(a). The prosecution filed a habitual offender bill of information, and Mr. Jones admitted his status as a second felony offender.[10] The trial judge then resentenced Mr. Jones as a habitual offender, stating:
Alright Mr. Jones, I’ve had the opportunity to review my notes from the trial *145 that took place throughout the week of April the 20th of 2015. Having gone over my extensive notes and the testimony of all the individual witnesses that have testified against you, I have to stress that I was really shocked by the level of violence. And basically, the rampage that you conducted throughout the City of New Orleans.
The actions that you chose to take throughout the course of the offenses for which you were convicted in addition to the Prieur acts that were introduced by the State, and the ballistic evidence that was posed against you, along with the eyewitness testimony against, you.
Plus the forensic evidence that link you to the weapon that was linked to multiple shootings, indicates that you have absolutely no regard for human life; no regard for the safety of any individual in this city.
And that you intended to execute as many people as you could. And the only reason that you were convicted of attempted [second degree] murders was because you were not a very good shot.
[[Image here]]
All right Mr. Jones, having gone over the multiple bill of information filed by the State, and the fact that you have chosen to admit that you have this prior conviction, I’m now taking into account the trial testimony and evidence that was introduced at trial.
Additionally, I’m taking into account Code of Criminal Procedure 894.1. Considering the fact that I find that your acts throughout the course of this chain of events in November 22, 2011, were particularly heinous.
I find that you are a risk to society, should you be released from incarceration. The fact that you have a prior conviction. The manner in 13nwhich you’ve chosen to conduct yourself throughout the course of these heinous acts, rises to level of a basis for a maximum sentence to be imposed.
The trial judge then imposed two concurrent 100-year sentences without benefit of probation, parole, or suspension of sentence on the two counts of attempted second degree murder.[11] These are the maximum terms allowable by statute. See La. R.S. 14:30.1 B; La. R.S. 15:529.1 A(1).
A trial judge has broad discretion when imposing a sentence, and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. See State v. Cann, 471 So.2d 701, 703 (La. 1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. See State v. Walker, 2000-3200, p. 2 (La. 10/12/01), 799 So.2d 461, 462
First, we find that the sentencing judge adequately complied with the sentencing guidelines under La. C.Cr.P. art. 894.1, taking into account the violent and serious nature of the offenses and Mr. Jones’s criminal history.
Mr. Jones claims that 100 years amounts to a life sentence, which is not authorized by the habitual offender statute under unless the two felonies are both sex offenses. See La. R.S. 15:529.1 A(2)(b). A review of the jurisprudence, however, establishes that Louisiana courts have affirmed 100-year sentences for persons convicted of attempted second degree murder and *146 found to be second felony offenders. See State v. Hills, 98-0507 (La.App. 4 Cir. 1/20/99), 727 So.2d 1215; State v. Hall, 606 So.2d 972 (La. App. 3 Cir. 1992). See also State v. Douglas, 39,036 (La.App. 2 Cir. 10/29/04), 888 So.2d 982 (defendant was not adjudicated a multiple offender, but had a lengthy criminal record and was |S1 sentenced to 100 years at hard labor for attempted second degree murder), and State v. Martinez, 2009-1057 (La.App. 5 Cir. 5/25/10), 40 So.3d 1113 (habitual offender sentence for attempted second degree murder conviction of 99 years at hard labor without benefit of parole, probation, or suspension of sentence not excessive).
While we do not wholly disagree that Mr. Jones’s sentences effectively constitute a life sentence, they are within the statutory sentencing range and therefore presumed constitutional. Although maximum sentences are generally reserved for the most serious violations and the worst offenders, see State v. Landry, 2003-1671, p. 8 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239, we note that Mr. Jones attempted to kill two people in broad daylight with an assault rifle, with clear disregard for public safety and the lives of innocent bystanders. We do not find that trial judge abused her discretion in imposing the maximum sentences, nor do we find that the sentences are disproportionate to the severity of the offenses. Accordingly, the 100-year concurrent sentences imposed in this case are neither excessive nor illegal.
CONCLUSION
We affirm the convictions of Kenneth Jones for two counts of attempted second degree murder and one count of being a felon in possession of a firearm. We likewise affirm the imposed sentences of 100 years for each count of attempted second degree murder, and 20 years for being a felon in possession of a firearm.
AFFIRMED

. Because there are two witnesses in this case who have the last name Smothers, they are referred to by their first names.

. At the time of trial, Eugene Brashears had been murdered. The record indicates that Julius Alexander, an associate of Back of Town, has been charged with the murder of Mr. Brashears.

. Casings recovered from a bar shooting on November 29, 2011, discussed in more detail in Part IV-B, post, were also found to have been fired from the discarded AK-47.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. Quintillion is a number represented as one followed by eighteen zeros.

. Moreover, we note that the verdict in this case was unanimous, which tends to support our decision not to reverse Mr. Jones’s convictions. See generally State v. Pierce, 12-0879, *138 p, 14 (La.App. 4 Cir. 12/10/13), 131 So.3d 136, 152 (Tobias, J., concurring) (would apply harmless error analysis to the improper seating of a peremptorily-challenged juror where the verdict was unanimous and only a 10-2 verdict was required to convict).

. State v. Prieur, 277 So.2d 126 (La. 1973), abrogated by State v. Taylor, 16-1124, 16-1183 (La. 12/1/16), 217 So.3d 283, 2016 WL 7030750.

. This shooting occurred six days after the charged offenses on November 22, 2011.

. Mr. Jones does not complain on appeal about his twenty-year sentence for being a felon in possession of a firearm.

. Mr. Jones had a prior conviction for possession of cocaine from Texas in 2008.

. The judge also imposed 20 years imprisonment on the count of being a felon in possession of a firearm, to run concurrently.