PITMAN, J.
A unanimous jury found Defendant Christopher Weston guilty as charged of one count of possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1, and one count of attempted second degree murder, in violation of La. R.S. 14:27 and La. R.S. 14:30.1. The state invoked the firearm sentencing provisions of La. C. Cr. P. art. 893.3, and Defendant was sentenced to 30 years at hard labor without benefits for the attempted second degree murder conviction and 15 years at hard labor without benefits and a $1,000 fine for the possession of a firearm by a convicted felon conviction, with the sentences to run consecutively. This appeal ensued. For the following reasons, Defendant's convictions and sentences are affirmed.
*726 FACTS
On the morning of May 8, 2016, Defendant went to a home on Queens Street in Shreveport and shot Lakordo Jamerson whom he had accused of stealing his cigarette at the RaceWay gas station and convenience store ("the store") on Hearne Avenue. He was charged with attempted second degree murder and possession of a firearm by a convicted felon. The following testimony was adduced at trial.
The victim, Lakordo Jamerson, testified about the events on May 8, 2016, that led to his shooting. He stated that at approximately 10:00 a.m., he went to the store with his sister Alexis Hobbs and his brother Daniel Hobbs because he needed more cigarettes. The three traveled in Daniel's car. After leaving the store, they were going to Kimberly Weeks's house to see his four-year-old niece. He stated that when he arrived at the store, Weeks was already there buying pizza. Before he went into the store, he set his cigarette down on "the brick right there right by the door of the store" so he could recover it when he left the store. He recalled that he was in the store a very short time, just long enough to make his purchase; and, when he came out, he picked up his cigarette. He testified that as he did so, "he [Defendant] walked out behind me" in front of the store and confronted me and said, "y'all just f --- me and just take my cigarette." He told Defendant he had not taken his cigarette and even offered him one, and the two discussed what brands they smoked. He stated that after their discussion, Defendant "gave us a little look" and "just walked to his car," a Ford Explorer, and got on his phone. Jamerson talked with Weeks and ultimately went back to Daniel's car. He identified Defendant in court as the person who confronted him over the cigarette.
Jamerson further testified that after he got into Daniel's car (a black Impala), they went to Weeks's house and parked in the front of the house. He and Alexis went into the house first, eventually followed by Daniel. Shortly thereafter, Weeks "came rushing in saying there was somebody looking in our [Daniel's] car with a long gun." He "came out to look" and did not see anyone by Daniel's car, but then "looked down the street and that when I seen the Ford Explorer and I guess they seen me come out." He testified that the Explorer was the same one Defendant had gotten into at the store. The Explorer had turned into someone's driveway and was turning around, heading back in his direction, and then "he stopped at a stop sign," as he (Jamerson) was standing at the back of the Impala. He realized that the person with the gun was the same person he had seen about ten minutes earlier at the store. He stated that all he saw "was the back window rolled down" and Defendant drop the gun; then he ran. He testified that when Defendant began shooting, his four-year-old niece and a toddler were outside.
Jamerson stated that he crouched down in front of the Impala, and he estimated that between 15 and 17 rounds were fired. The first shot hit the trunk of the Impala when he and Daniel were taking cover on the side of the car. He left the protection of the car because his niece was still on the porch and ran "up the hill and tried to get near her in the house," but did not make it because he slipped. He did not know where the shots were going. He tried to get his niece, but someone had already taken her in the house. He tried to run to the corner of the house and could still hear shots being fired, and it was then that he was shot. He stated that he was running with his phone in his hand and that the "gun must have been powerful," because "when it hit [him]," it threw his body "upwards *727 and [his] phone flew all the way under another vehicle."
Jamerson further stated that he was first hit in his arm and the bullet traveled into his back; the bullet is still in him and cannot be removed because of the danger of paralysis. He stated that "you could see my bone," and there was blood everywhere. The shot in his arm slowed the bullet down and saved him, and he was happy to be alive because he has three children. He was in the hospital for two weeks and has numbness in his right leg because of the bullet that remains in his back. He also testified that he "can't work." The state introduced a box of "Kool short" cigarettes into evidence, which he identified as the type of cigarettes he smoked and bought in the store the day of the shooting.
Jamerson also testified that he had never seen Defendant prior to the shooting and described the encounter at the store as "nothing," just talk. He stated that the incident could have been avoided and that he had never been through anything like this before in his life. He identified Defendant as the man who shot him, but did not want to look at him.
On cross-examination, Jamerson confirmed that the encounter with Defendant at the store did not involve threats by either party. In addition to his previous testimony, he added that he was able to identify Defendant's vehicle as a white Ford Explorer because his family members had the same type of vehicle. He testified that the vehicle had a flat tire, or a donut tire. He could not recall if the vehicle had damage, a bumper sticker or a license plate, but reiterated that it was "the same truck you know, the same one and the same guy who was at RaceWay was in the back of that truck."
Jamerson described Defendant as having short dreads. He did not recall what he was wearing, but remembered he had a flip phone.
When asked about the Ford Explorer arriving at the house, Jamerson testified that he believed that there were two people in the vehicle because he saw Defendant roll the back window down. He also thought the driver was female because "there was a ponytail that sit straight at the top" of her hair; the driver's window was down enough for him to see the ponytail. The driver's hair was black. He did not know the race of the driver and agreed that it could have been a male. He confirmed that the driver had not been with Defendant at the store.
Jamerson described the gun as having a "brown tip thing" that was long, like a rifle, that he called "a Draco, a Chopper." He confirmed that Defendant was the man with the gun. He recognized his face when he saw "his dreads and stuff and his face hanging out the window." He and Daniel confirmed to each other that this was "the same guy from the RaceWay."
Jamerson further testified that the shooter shot from the passenger side in the back seat because the house was on the passenger side. He stated that the car was stationary while the shots were fired, and none of the occupants said anything. He did not see the car drive off because he had been shot. He stated that his memory of the events was fine and he "remember[ed] it like yesterday," because this was the first time in his life something serious had happened to him. He denied using drugs or alcohol at the time and was on no medication.
Jamerson did not know why Defendant shot him or "why it was a problem." He never saw Defendant again; but, about three days after his two-week hospital stay, he was shown a photographic lineup at Weeks's house and he identified Defendant *728 as the man who shot him. He recalled that the lineup contained about six or seven photos on one piece of paper. He had previously been shown a lineup when he was in the hospital, but he was in no condition to identify his assailant. He confirmed that neither detective suggested a certain photograph to him.
Daniel, Jamerson's older brother, substantially corroborated Jamerson's version of the events that occurred at the store, including his version of what Defendant said to Jamerson, accusing him of taking his cigarette. He identified Defendant as the person he saw come out of the store and stated that he had never seen him before and did not know his name.
Daniel confirmed that Jamerson asked the man what kind of cigarettes he smoked, and the man said "Newports." He recalled that his brother "pulled out a pack of Kools" and told the man, "we smoke Kool." He saw the man walk to his car, which was at a gas pump, and which appeared to have a flat tire. The man made a phone call. He stated that the man's car was white and it was "like, a Jeep" or SUV. He testified that he and his brother and sister left the store while the man was pumping gas.
Daniel also corroborated Jamerson's description of their journey to Weeks's house. He confirmed that Weeks came into the house and she asked him and Jamerson if they knew "this guy right here," because he had been following her. He and Jamerson walked outside to see who it was and saw "the same car from RaceWay, the same flat tire, the same everything." He corroborated Jamerson's description of the actions of the white Explorer, but added that once the car parked on the side of the road, he saw "him [Defendant] jump into the back of the car, up in the back of the seat" with a "Draco" or "AK-47." He estimated that he was about three feet from him, standing right at his car. The man pulled out the gun, dropped it and then picked it up and started shooting. He identified Defendant as the shooter.
Daniel stated that he then got into his car and tried to leave, but a bullet hit his car. He confirmed that Jamerson ran up the hill toward the house and fell. As he started to drive away, he saw Jamerson on the ground, shot, so he picked up Jamerson and noticed that the white car was no longer there. He confirmed that "[a] whole bunch of kids" were outside on the porch when the shots began, although he did not know how many shots were fired.
Daniel identified a copy of a six-person photographic lineup shown to him and from which he identified Defendant as the shooter. He confirmed that the dispute at the store was only a verbal conversation, started by Defendant, over a cigarette.
On cross-examination, Daniel testified that the vehicle driven by Defendant was white, "Jeep like," but stated that he was not good with cars. He recalled that the vehicle was a four-door and that there was nothing unusual about it, except that it had a flat or low tire. He stated that when he saw the vehicle at Weeks's house, the tire was still low. He testified that there was only one person in the vehicle at the store, but there were two at Weeks's house, so Defendant must have called somebody.
Daniel described the second person in the white vehicle as being "chubby, low cut," having "all even hair," and was a medium-toned black male. He stated that no words were exchanged and that Defendant "just fired shots for nothing." He recalled that the barrel of the gun was black; he did not recall if the vehicle had any window tinting.[1]
*729 Weeks corroborated the testimony of Jamerson and Daniel regarding the encounter with Defendant at the store. She estimated that she left the store approximately three to four minutes after Jamerson, Daniel and Alexis, who were all waiting for her when she got home. After she got out of her car, she saw "the vehicle that the person that walked outside of RaceWay got into" pull up in front of her house. She went into the house and told Jamerson and Daniel that the "car we just got into it with at the RaceWay is in front of the house" and that she did not know what was happening. She stated that as soon as Jamerson, Daniel and Alexis went outside, "the car took off and they went all the way down to the end of the street, did a U-turn and c[a]me back." She recalled Alexis saying that the people in the car had a gun, so she took her children and put them in the house.
Weeks testified that before she could get into her house, the "gun started going off." She found a casing the next day where a bullet had gone through a room at the back of her house, but she threw it away. She confirmed that she viewed a photographic lineup, but was unable to identify anyone as the perpetrator.
On cross-examination, Weeks testified that her roommate found a shell casing in the house in "the corner of the back bedroom" when she was cleaning that room the day after the shooting. She stated that she did not see the person shooting from the vehicle, but that she heard about "a good 15" shots. She confirmed that nobody shot from her house and that there were people on the porch when the shooting started.
Weeks also testified that when she left the store, she did not notice the white vehicle follow her, but assumed the driver did because she did not know the man and he would not have known where she lived. She would not say that she assumed it was the same person; she stated that she saw the same vehicle as the one at the store.
Detective Marlon Clark of the Shreveport Police Department testified that he investigated the crime on May 8, 2016. He received a call shortly after 10:00 a.m. notifying him of a shooting that occurred at 2210 Queen Street in Caddo Parish. He was told that an individual was taken to University Health with serious, but not life-threatening injuries. He spoke with the witnesses and learned about the encounter at the store, where he went with "the CSI" to view the video surveillance footage. The video showed Daniel, Jamerson and Weeks talking in front of the store. He testified that "you could see the white Ford Explorer pull up, park at the gas pump," and a "black male, heavyset, with some short dreads walk into the store, purchase something at the counter and walk out." The video also showed "a verbal exchange between him and the other people outside and then he walks back to the car."
Det. Clark confirmed that the video showed no physical altercation and that "approximately seven minutes later the victim and the people that were with him ended up leaving," traveling "kind of north which would be towards Queen Street off of Claiborne." He stated that the white Explorer stayed there, but, after several minutes, it left. The video shows several minutes later "what appears to be the same white Ford Explorer cut through the parking lot of RaceWay and then go back down Claiborne towards the direction of Queen Street."
Det. Clark further testified that the store video was collected on a thumb drive by a CSI detective who gave him a copy *730 containing the wrong footage. He identified an exhibit which was the empty folder that contained the erroneous DVD copy. He had marked the folder with the case number and written, "Target: White Ford Explorer pulls up, male driver with dreadlocks enters the store and looks at camera," and placed it in his case file.
Det. Clark also testified that he went to the hospital and spoke to Jamerson, who was in extreme pain from his injuries and unable to give him basic information about the shooting. He stated that no one he spoke to knew the name of the man at the store, but Jamerson told him that it was the same person who had shot him. He interviewed Daniel on the day of the incident, who indicated that he had not seen the man at the store before.
Det. Clark further testified that several weeks later he received information that Defendant was the shooting suspect. He located a photograph of him, which matched the video footage from the store. He created a six-person photographic lineup, which he showed to Jamerson at Weeks's house. He identified the lineup, stating that Jamerson viewed it and "immediately identified image number four as the suspect which was Christopher Weston." He stated that Daniel also identified Defendant from the lineup as the person who fired from the vehicle. He testified that although they were at the same address, Jamerson and Daniel separately viewed the lineup at different times.
Det. Clark drafted an arrest warrant for Defendant on charges of attempted second degree murder and possession of a firearm by a convicted felon and pulled a criminal history report on him. He determined that Defendant had previously been convicted of a felony in Caddo Parish. He was shown the record of case docket number 282,184 and verified that the bill of information contained the name Christopher Weston. He read into the record the minute entry of September 23, 2010, as follows:
The accused present with counsel, Alex Rubenstein, withdrew his former plea of not guilty and pled guilty to count number one and count number two, attempted illegal carrying of weapons while in possession of CDS. The Court informed the defendant of his constitutional rights as per Boykin v. Alabama (see court reporter's transcript.) Whereupon, the defendant was sentenced, as to count number one, to pay a fine of $2,000 and court costs, or in default thereof, to serve 60 days in the parish jail to be paid through inmate banking and, in addition, to be confined to hard labor for a period of five years and committed to the Louisiana Department of Corrections subject to the conditions provided by law. The defendant was sentenced to count number two to be confined at hard labor for a period of two years and committed to the Louisiana Department of Corrections subject to the conditions provided by law. The Court ordered said sentence to run concurrently with any other sentence with credit for time served and informed the defendant of the right to post-conviction relief proceedings. The Court ordered the money and weapons forfeited.
Det. Clark testified that he contacted the U.S. Marshal's task force in an attempt to locate Defendant. As he researched Defendant, he received information regarding a Jacorey Smith, who did not appear in the store video. He stated that the U.S Marshals investigated a Lincoln Town Car that stopped at a house on DeSoto Street. The agents sat outside and waited as the three occupants of the vehicle went into the house. He was uncertain as to why the U.S. Marshals focused on this vehicle, but he suspected that they had "gotten information that that house *731 was possibly associated with Christopher Weston." After the occupants of the home left in the vehicle, U.S. Marshals conducted a traffic stop. He was present at that stop and confirmed that there were three black males in the Lincoln Town Car, one of whom was Defendant. He testified that Defendant was taken into custody, and he identified him in court.
Det. Clark further testified that after Defendant's arrest, a search warrant was obtained for the DeSoto Street residence belonging to Jacorey Smith. He was present when the house was searched and stated that two firearms were recovered, one of which he identified as the rifle that had been recovered from a closet in a downstairs bedroom of the DeSoto residence. The rifle was offered into evidence as Exhibit S-9.[2] He stated that it was a 7.62 caliber rifle that he "always kind of called it AK-47," although he knew this was not technically correct, and that the gun also was known as a "Draco" or "Chopper." He testified that it was determined that Jacorey Smith lived at the house on DeSoto Street and that the gun found there was not fingerprinted because, in his experience, the surface of the gun would never produce a print that could be matched. He stated that no DNA analysis was performed on the gun.
On cross-examination, Det. Clark testified that no shell casings or projectiles were found at the scene and that there were "none found in the house or at the vehicle where it was struck." He noted that there were fragments in the victim himself, but they were not removed. He also confirmed that neither Defendant's fingerprints nor DNA were found on the rifle because it was not processed and that it could not be connected to the shooting since no shell casings or bullets were recovered from the scene. He confirmed that it was possible that it was not the firearm used to shoot Jamerson. He stated that he was not aware that a shell casing was found in Weeks's house the next day and that her house was never searched.
Det. Clark stated that the store's color video showed a black male with "a twist" and the white Explorer parked in the gas line, 30 to 40 feet from the front door where the camera was located. He did not observe a flat tire on the vehicle. He did not realize until he prepared for trial that the video was gone. He checked to see if "it was in our system as a backup, and it was not." The video did not show the license plate of the vehicle and he was never able to locate the white Explorer or its possible owner. He confirmed that there were no indications that Defendant lived at the DeSoto Street house where the rifle was found and that he could not determine whether Defendant owned a white vehicle.
On redirect, Det. Clark testified that he believed the shell casings were in the vehicle if the gun was fired from inside, explaining that "if the window is down and the barrel is sticking out, the round of the shell casing should eject back or right." He stated that the shell comes from the side, so if the barrel were outside the window, it would eject into the car.
Officer Roderick Lewis testified that he was on patrol when he received a radio communication from U.S. Marshals requesting an available unit. He responded and was "take down unit," activating his lights and sirens to make a traffic stop of the vehicle which had illegal switched tags.
*732 After stopping the vehicle, he made contact with the driver and two passengers and called the stop into dispatch. A video of the stop was recorded, and a portion of that video was played for the jury. He further testified that one of the individuals in the stopped vehicle identified himself as Christopher Weston. The officers informed him they had a warrant for his arrest for attempted murder.
On cross-examination, Ofc. Lewis conceded that he was not involved in the investigation of events that occurred on May 8, 2016, and confirmed that he stopped the "Lincoln Town Car" because it was already under surveillance by the U.S. Marshals, and he had been instructed to follow it.
Carla White, tendered as an expert in firearms examination, identified a box of evidence, which included a 7.62x39 millimeter rifle, marked as Exhibit S-9. She tagged the rifle and test fired it and packaged the test fires in a brown envelope identified and marked as Exhibit S-10. She identified the "NW number" as the case number which would be put on any item received by her.
On cross-examination, White testified that the gun "brand is a Century Arms," and the model number was "GP1975 Sporter." She confirmed that an AK-47 "is a specific model of a 7.62x39 millimeter gun," explaining that "a lot of times people refer to a gun of this caliber as an AK-47," but that this gun "is not specifically an AK-47." She agreed that the gun was not an AK-47, but was the same 7.62 caliber.
White also confirmed that she never received any projectiles to test from police and did not fingerprint the weapon or detect any signs that any attempt had been made to fingerprint it. She stated that the "type of surface on this gun" would make it difficult to determine. She testified that she could not tell if the firearm had been fired. She also testified that the firearm had remained at the crime lab until the day of her testimony and that no DNA analysis was conducted on the gun.
Officer Danny Duddy of the Shreveport Police Department testified that he was the current supervisor of the crime scene investigation unit and was a certified latent fingerprint examiner. He was qualified as an expert in fingerprint identification. He identified an exhibit which contained Defendant's fingerprints from case docket number 282,184.[3] He was allowed to take Defendant's fingerprints in court, which were also introduced into evidence. He compared the fingerprints from docket number 282,184 and those he had just taken and testified that they were made by the same individual.
The defense rested and did not call any witnesses.
The jury returned unanimous verdicts on both counts. Defendant filed a motion for post-verdict judgment of acquittal, which the trial court denied prior to sentencing. Defense counsel waived the sentencing delays of La. C. Cr. P. art. 873, and Defendant was sentenced to consecutive sentences of 30 years at hard labor without benefit of parole, probation or suspension of sentence for the attempted second degree murder conviction and 15 years at hard labor without benefit of parole, probation or suspension of sentence, and a $1,000 fine, for the possession of a firearm by a convicted felon conviction. On the verdict form, the jury also found that Defendant's *733 use/discharge of a firearm in the commission of the attempted second degree murder had been established by clear and convincing evidence under La. C. Cr. P. art. 893.3. After the trial court denied Defendant's pro se and counseled motions to reconsider sentence, this appeal ensued.
DISCUSSION
On appeal, Defendant raises two assignments of error. He first contends that the evidence was insufficient to convict him of the attempted second degree murder of Jamerson due to the conflicting and unreliable testimony of the witnesses. Second, he argues that the imposed sentences were constitutionally excessive as the trial court failed to adequately consider mitigating factors. He contends that the sentences are disproportionate to the acts involved because he did not have the specific intent to kill Jamerson and "it is suspect" that he was actually the shooter. He asserts that the imposed sentences are effectively a life sentence that fail to serve the goals of punishment and rehabilitation.
The state argues that the eyewitness accounts were sufficient to support both convictions. It asserts that the eyewitness accounts showing his act of aiming a firearm and shooting some 15 to 17 shots after following Jamerson from the store were sufficient to establish his specific intent to kill Jamerson. It also asserts that the imposed sentences are not constitutionally excessive, noting that the trial court found no mitigating factors applicable to Defendant. It contends that the factors considered by the trial court provided adequate support for the imposition of consecutive sentences and urges this court to consider that the shooting of Jamerson was totally senseless and caused by an argument over a cigarette that was not his, the particular viciousness of the crime, the significant suffering caused to the victim and Defendant's extensive criminal record.
Sufficiency of the Evidence
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717, writ denied , 16-1479 (La. 5/19/17), 221 So.3d 78. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robinson , supra . The appellate court does not assess the credibility of witnesses or reweigh evidence. Id. A reviewing court accords great deference to the fact finder's decision to accept or reject the testimony of a witness in whole or in part. Id.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Id. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Ward , 50,872 (La. App. 2 Cir. 11/16/16), 209 So.3d 228, writ denied , 17-0164 (La. 9/22/17), 227 So.3d 827.
When the key issue is the defendant's identity as the perpetrator, the state is required to negate any reasonable probability of misidentification. Id. Positive *734 identification by only one witness is sufficient to support a conviction. Id.
To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27 and 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," attempted second degree murder requires specific intent to kill. State v. Bishop , 01-2548 (La. 1/14/03), 835 So.2d 434.
Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. State v. Murray , 49,418 (La. App. 2 Cir. 1/14/15), 161 So.3d 918, writ denied , 15-0379 (La. 4/8/16), 191 So.3d 582. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Id. Specific intent to kill may be inferred from the extent and severity of the victim's injuries. Id. Defendant's actions of shooting the victim multiple times can demonstrate specific intent to kill. Id.
At the time of the offense, La. R.S. 14:95.1 provided, in relevant part, that it is unlawful for any person who has been convicted of attempted possession of a firearm while in the possession of a controlled dangerous substance or possession with intent to distribute marijuana, a Schedule I controlled dangerous substance, to possess a firearm or carry a concealed weapon.
To support a conviction for possession of a firearm by a convicted felon, the state must prove: (1) the possession of a firearm; (2) a previous conviction of an enumerated felony; (3) absence of the ten-year statutory period of limitation; and (4) general intent to commit the offense. State v. Castor , 50,512 (La. App. 2 Cir. 4/13/16), 194 So.3d 668. General criminal intent is present when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10 ; State v. Johnson , 03-1228 (La. 4/14/04), 870 So.2d 995.
A defendant may be convicted for attempted second degree murder and possession of a firearm by a convicted felon arising out of the same incident. State v. Jones , 15-0956 (La. App. 4 Cir. 3/22/17), 214 So.3d 124 ; State v. Richardson , 16-107 (La. App. 3 Cir. 12/28/16), 210 So.3d 340. Upon review of the evidence in the light most favorable to the state, the state's proof is sufficient to support both verdicts of attempted second degree murder and possession of firearm or carrying a concealed weapon by a person convicted of certain felonies.
If believed, the eyewitness accounts of both Jamerson and Daniel identifying Defendant as the shooter are sufficient to support both crimes. Both men got a close view of him and the white Ford Explorer only minutes before the shooting began. While standing very close to that vehicle again at Weeks's house, the men were able to match the "donut tire" to the one they had observed at the store, as well as Defendant's hair style and face. These present sense impressions were reasonably accepted by the jury. The reliability of their eyewitness accounts is further buttressed by the fact that both men independently and easily identified Defendant from separate photographic lineups some *735 weeks after the shooting, thereby establishing the extent of the impression he made on each of them. Weeks's and Det. Clark's testimony corroborated the fact that the white vehicle at the store was the same vehicle in front of Weeks's home at the time of the shooting. Any variations and conflicts within the witnesses' testimony were not material to Defendant's identification as the shooter. Even so, it was within the jury's purview to weigh this evidence and resolve any inconsistencies.
From the eyewitness accounts establishing that several shots were fired, as well as facts showing Defendant's pursuit of Jamerson after the two left the store following the verbal altercation, the jury could have reasonably inferred that he possessed the specific intent to kill Jamerson and committed an overt act tending toward the accomplishment of the victim's death. These eyewitness accounts are also sufficient to establish Defendant's possession of a gun, as well as his general intent to commit the offense.[4] Proof of his previous conviction of a felony in 2010 completes the necessary proof required to establish the firearm possession charge.
On these grounds, Defendant's convictions were established by sufficient evidence and this assignment is without merit.
Excessive Sentence
When reviewing an excessive sentence claim, the appellate court uses a two-prong test. First, the trial record must demonstrate that the trial court complied with La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating and mitigating circumstance, but the record must reflect that the trial court adequately considered the guidelines of La. C. Cr. P. art. 894.1. State v. Smith , 433 So.2d 688 (La. 1983) ; State v. Jackson , 51,575 (La. App. 2 Cir. 9/27/17), 244 So.3d 764 ; State v. Modisette , 50,846 (La. App. 2 Cir. 9/28/16), 207 So.3d 1108. The trial court should consider the defendant's personal history and prior criminal record, the seriousness of the offense, the likelihood that the defendant will commit another crime and the defendant's potential for rehabilitation. State v. Jackson , supra ; State v. Modisette , supra . The trial court is not required to assign any particular weight to any specific matters at sentencing. State v. Modisette, supra .
Second, the appellate court must determine if the sentence is constitutionally excessive. A sentence is excessive and violates La. Const. art. I, § 20, if it is grossly out of proportion to the severity of the crime or is nothing more than the purposeless and needless imposition of pain and suffering. State v. Bonanno , 384 So.2d 355 (La. 1980) ; State v. Jackson , supra ; State v. Modisette , supra . A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Modisette , supra . A trial court has wide discretion in imposing a sentence within the statutory limits, and a sentence should not be set aside absent a showing of abuse of discretion. State v. Jackson , supra ; State v. Modisette , supra . The trial court is in the *736 best position to consider the aggravating and mitigating circumstances of a particular case. State v. Jackson , supra . Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence. State v. King , 48,335 (La. App. 2 Cir. 8/7/13), 122 So.3d 1042, writ denied , 13-2017 (La. 5/2/14), 138 So.3d 1238.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. Although Article 883 favors imposition of concurrent sentences for crimes committed as part of the same transaction or series of transactions, a trial court retains the discretion to impose consecutive penalties in cases in which the offender's past criminality or other circumstances in his or her background or in the commission of the crimes justify treating him or her as a grave risk to the safety of the community. State v. Walker , 00-3200 (La. 10/12/01), 799 So.2d 461 ; State v. Simpson , 50,334 (La. App. 2 Cir. 1/13/16), 186 So.3d 195. Concurrent sentences arising out of a single course of conduct are not mandatory. State v. Simpson , supra . Consecutive sentences under those circumstances are not necessarily excessive. Id. Among the factors to be considered are the defendant's criminal history, the gravity or dangerousness of the offense, the viciousness of the crimes, the harm done to the victims, whether the defendant constitutes an unusual risk of danger to the public, the potential for the defendant's rehabilitation, and whether the defendant has received a benefit from a plea bargain. Id. and cases cited therein. The failure to articulate specific reasons for consecutive sentences does not require remand if the record provides an adequate factual basis to support consecutive sentences. Id.
A presentence investigation report is an aid to help the court, not a right of defendant, and the court is not required to order one. La. C. Cr. P. art. 875 ; State v. Scott , 50,920 (La. App. 2 Cir. 11/16/16), 209 So.3d 248, 253, writ denied , 17-0353 (La. 11/13/17), 229 So.3d 478.
Defendant's sentencing occurred on December 14, 2017. No presentence investigation report was ordered by the court. The trial court initially reminded Defendant that a jury had convicted him of attempted second degree murder, possession of a firearm by a convicted felon and also "concluded that he did discharge" a firearm during the commission of this offense causing bodily injury, under the firearm enhancement statute.[5] The trial court informed him of the applicable sentences he faced for his convictions, of his rights to appeal, to file a motion for reconsideration of sentence and the applicable delays for filing post-conviction relief.[6]
*737 Thereafter, the trial court noted consideration of certain La. C. Cr. P. art. 894.1 sentencing factors, including that there was an undue risk that he would commit another crime if a suspended sentence were imposed, that he had need of correctional treatment in a custodial environment and that a lesser sentence would deprecate the seriousness of his crime. The trial court considered as aggravating factors the facts that Defendant's conduct during the offense manifested a deliberate cruelty to the victim, who was shot and has lasting problems because of the injury inflicted, and that he knowingly created a risk of death or great bodily harm to more than one person, considering that bystanders were placed at risk when the shooting occurred. Defendant's use of a semi-automatic rifle in a neighborhood filled with adults and children was actual violence used in the commission of the subject offense, according to the trial court. The trial court also considered that this offense caused permanent injury to the victim, who still has the bullet in his body and suffered severe nerve damage, causing numbness in his leg. The trial court observed that the victim was emotional and very upset about the crime and thankful that he had not been killed.
The trial court specifically found that Defendant used a dangerous weapon while committing an offense which has an element requiring the use, attempted use or threatened use of physical violence against the person or property of another and which by its very nature involves a substantial risk that physical force may be used in the course of committing the offense. The trial court also determined that no mitigating circumstances existed in this case and considered Defendant's prior record as a relevant circumstance. The trial court informed Defendant that attempted second degree murder was a crime of violence under La. R.S. 14:2(B) and ordered the minutes to reflect this fact.
The trial court then sentenced Defendant to 30 years at hard labor without benefit of parole, probation or suspension of sentence for the attempted second degree murder conviction and 15 years at hard labor without benefit of parole, probation or suspension of sentence and a $1,000 fine for the possession of a firearm conviction. The sentences were imposed consecutively. The court imposed concurrent court costs and ordered him to pay $50 for each count to the public defender which were imposed concurrently with the $1,000 fine.
On January 3, 2018, Defendant filed a pro se motion to reconsider sentence requesting the trial court to "rule sentence excessive." On January 4, 2018, a counseled "Motion to Reconsider and Vacate Unconstitutionally Excessive Sentence" was filed on the grounds that the "reasons given by the trial court as aggravating factors were inadequate to support the severity of the sentence imposed" and that certain of the aggravating factors considered by the trial court were improper. Defendant also argued that the court failed to fully consider all mitigating factors in sentencing. In a written "Opinion," the trial court summarily denied the excessive *738 sentence claims on January 11, 2018. Although the trial court only referenced the January 3, 2018 motion to reconsider, the date of its ruling would indicate that both motions were considered.
Upon constitutional review, the imposed sentences are not excessive. The record reflects clear La. C. Cr. P. art. 894.1 compliance by the trial court. Despite Defendant's claims that the trial court failed to consider mitigating factors, the record shows that it exercised its prerogative to find that no mitigating factors existed in this case. This determination is supported by the record. The imposed sentences cannot be said to be disproportionate to his acts. The eyewitness accounts were sufficient to establish Defendant's specific intent to kill, and his senseless acts, caused by his claim to a cigarette, endangered the life of several bystanders, including innocent children. His violent pursuit of the victim is disturbing. His acts seriously injured and traumatized Jamerson, who has lasting scars and physical injuries. Ultimately, Defendant's actions can be described as nothing less than a blatant and senseless disregard for human life that included small children. Despite the fact that the trial court was not aided by a presentence investigation report, the record is sufficient to establish that the 27-year-old Defendant had previous gun- and drug-related convictions and failed to benefit from prior leniency in sentencing.
Although the trial court did not specifically provide a thorough explanation of the factors it considered in ordering the sentences to run consecutively, the record it provided sufficiently supports the consecutive imposition of the sentences. It contemplated the dangerous and vicious nature of the offenses, the impact on the victims, Defendant's criminal history and the risk he posed to the public.
Considering all of these factors on review, the midrange sentences were adequately tailored to the crimes and Defendant. Ultimately, the aggregate 45-year consecutive term cannot be said to be shocking to the sense of justice or a needless and purposeless imposition of pain and suffering under the facts of this case.
CONCLUSION
For the foregoing reasons, the convictions and sentences of Defendant Christopher Weston are affirmed.
AFFIRMED.

On redirect, Daniel confirmed that the shooting occurred at Weeks's house in Shreveport, Caddo Parish.

The defense objected to the introduction of the gun into evidence on the grounds of relevance. The trial court overruled the objection because of Daniel's testimony that the black gun he saw at the time of the shooting was an AK-47. This issue has not been raised on appeal.

The exhibit included the bill of information containing Defendant's fingerprints and certified court minutes from his 2010 guilty pleas to one count of attempted illegal carrying of weapons while in the possession of a controlled dangerous substance and one count of possession with intent to distribute marijuana.

The state's proof that a gun fitting the description of the one used to shoot Jamerson was found a few weeks after the crime at a location from which Defendant had just left is arguably only tangential and circumstantial proof that after the crime, Defendant hid the crime weapon at the DeSoto Street residence. This fact alone would be insufficient to prove his constructive possession of the gun because the mere presence of a defendant in the area of the contraband or other evidence seized alone does not prove that he had dominion and control over the evidence and, therefore, had it in his constructive possession. State v. Johnson , supra .

La. C. Cr. P. art. 893.3 requires the court find by clear and convincing evidence that the offender actually possessed a firearm during the commission of the felony for which he was convicted. However, in acknowledging the jury's finding from the jury verdict form submitted to them, it is apparent that the trial court ratified the jury's determination that the state proved by clear and convincing evidence that Defendant discharged a firearm during the commission of the offense and thereby caused bodily injury.

For attempted second degree murder, Defendant faced sentencing exposure of not less than 10 nor more than 50 years without benefits. However, under the firearm enhancement sentencing provisions of La. C. Cr. P. art. 893.3(D), Defendant faced an increased minimum sentence of 15 years because bodily injury occurred. The trial court erroneously read La. C. Cr. P. art. 893.3(E), which provides for a minimum sentence of 20 years if the crime is a crime of violence under La. C. Cr. P. art. 893.3(E)(1)(b) and the firearm is discharged. Attempted second degree murder is not classified as a crime of violence under this provision. This error appears to be harmless because the trial court imposed a sentence above either mandatory minimum. For the felon in possession of a firearm conviction, the trial court neglected to state the sentencing range, but noted that Defendant faced a fine of not less than $1,000 nor more than $5,000. The sentencing range is not less than 10 nor more than 20 years at hard labor without benefits.