# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #45

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the 22nd day of October, 2019, are as follows:

**PER CURIAM:**

*2017-K-00658*        *STATE OF LOUISIANA VS. KENNETH JONES* (Parish of Orleans)

From the district court's lone statement that it was not satisfied with defendant's proffered race-neutral reasons, we find it inappropriate to infer that the district court did not blur the line between Batson's second and third steps, that the district court was persuaded after it properly weighed the State's proof against the defendant's proffered race-neutral reasons, and that the court did not impermissibly shift the burden onto the defense to rebut the State's prima facie case. See State v. Harris, 15-0995 (La. 10/1916), 217 So.3d 255; State v. Nelson, 10-1724 (La. 3/13/12), 85 So.3d 21; State v. Green, 94-0887 (La. 5/22/95), 655 So.2d 272. Accordingly, we reverse the court of appeal, vacate the convictions and sentences, and remand the case to the district court for a new trial. We also encourage the district court to consider carefully on retrial: (1) whether the State can present sufficient competent evidence at trial that defendant engaged in the alleged other crimes; (2) whether the other crimes evidence, considered on an individual basis, has an independent relevance outside of its implications for defendant's character; (3) whether the admission of the State's other crimes evidence comports with the rules governing hearsay; and (4) whether the probative value of the State's other crimes evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time" in accordance with La. C.E. art. 403.

REVERSED AND REMANDED.

Chief Judge Susan M. Chehardy of the Court of Appeal, Fifth Circuit, appointed as Justice pro tempore, sitting for the vacancy in the First District.

Retired Judge Michael Kirby appointed Justice ad hoc, sitting for Clark, J.

Johnson, C.J., additionally concurs and assigns reasons.

Weimer, J., concurs in part and dissents in part and assigns reasons.

Crichton, J., dissents and assigns reasons.

Chehardy, J., dissents for the reasons assigned by Crichton, J.

## SUPREME COURT OF LOUISIANA

### No. 2017-K-00658

### STATE OF LOUISIANA

### versus

### KENNETH JONES

### ON WRIT OF CERTIORARI TO THE FOURTH CIRCUIT
### COURT OF APPEAL, PARISH OF ORLEANS

**PER CURIAM:\***

On November 22, 2011, four men, including Merlin Smothers and Jeremiah Harris, were engaged in illegal activities in Harris's vehicle when a blue Monte Carlo pulled up behind them. A person stood up through the Monte Carlo's sunroof and began shooting at them with an assault rifle. Harris was shot but survived. Smothers escaped injury. Police chased the Monte Carlo and ultimately apprehended the driver of the vehicle, Eugene Brashears, who was the only person in the vehicle by the time police were able to catch it. Smothers and Harris described the shooter as a black male wearing a red hat but they were otherwise unable to identify him. Two red hats were found in the vehicle but no firearm remained. DNA recovered from one red hat matched Brashears and he tested positive for gunshot residue. No one was charged with this shooting at the time and Brashears was deceased by the time of defendant's trial.

On December 2, 2011, police conducted aerial surveillance of a white pickup truck. During that surveillance police saw two people, one of whom

---

\*Chief Judge Susan M. Chehardy of the Court of Appeal, Fifth Circuit, assigned as Justice pro tempore, sitting for the vacancy in the First District. Retired Judge Michael Kirby appointed Justice ad hoc, sitting for Justice Marcus R. Clark.

matched defendant's description,[1] exit the truck and appear to discard an object. Police recovered an assault rifle in the vicinity.

Two years later when Smothers and Harris were arrested on federal charges related to heroin distribution they identified defendant as the shooter in the incident on November 22, 2011. Defendant was indicted by grand jury with two counts of attempted second degree murder and one count of possession of a firearm by a convicted felon. The trial commenced in 2015.

During jury selection, defendant objected to the State's use of four peremptory challenges to remove African-American jurors in light of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *State v. Collier*, 553 So.2d 815 (La. 1989). The following colloquy then occurred:

> The Court: What is your response?
>
> The State: My first response would be that there [are] two African-Americans that we are going to keep on the Jury. The second response would be that of all the cuts used by Defense counsel, they are all on white Jurors. The third response, as to Ms. Hills, Judge, is that, first she is an educator and is—I had some concern when I asked her about her prior Jury service. First she didn't say anything, and then she couldn't give us any details about the type of crime, when it took place or anything like that.
>
> The Court: I will note for the record that of the five challenges the State has exercised, one of them is a white male. So, per se, it is not satisfied and I accept the State's response as to the challenge, in addition to that.

Thereafter, the State objected to the defendant's use of ten peremptory challenges to remove white jurors in light of *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct.

---

[1] Defendant called Jonathan Alexander to testify that the aerial surveillance video showed Alexander and Ryan Miner rather than defendant. Subsequently, the State in the prosecution of Alexander and Miner filed a motion seeking to introduce this testimony from the present trial as proof that codefendants Alexander and Miner drove through a particular neighborhood while armed with an assault rifle at a particular time. The admissibility of that evidence was addressed in *State v. Miner*, 17-1586 (La. 01/04/18), 232 So.3d 551. Whether the State engaged in prosecutorial misconduct by advancing inconsistent theories in different prosecutions, however, is beyond the scope of the present record.

2348, 120 L.Ed.2d 33 (1992) and *State v. Knox*, 609 So.2d 803 (La. 1992). The court stated that "I'm noting that the State has satisfied that first level, they are all white" but also noted that most of the stricken jurors had already left the courthouse.[2] Therefore, the court asked the defense for reasons for exercising just three of the strikes of jurors Fiegel, Luke, and Laughlin. Regarding juror Fiegel, the defense stated the following:

> I'm striking Mr. Fiegel, Your Honor, because Mr. Fiegel didn't talk much and I think Mr. Washington didn't really question him that much. The only thing I know about him is that he is a disc jockey at a radio station. I don't know what kind of radio station that is. Through our error, we didn't ask him any—we didn't get a feel for—one way or another, I struck him because he wasn't very talkative.

The defense then explained that it struck juror Luke because he appeared over-eager to serve on the jury and looked at the defendant "in a negative way," and that it struck juror Laughlin for expressing pro-prosecution views regarding witnesses who testify pursuant to plea agreements with the State. The court then ruled: "You have satisfied your race neutral basis for Jurors Luke and Laughlin. I am not satisfied with your response as to Mr. Fiegel. *Batson* challenge is granted as to Juror No. 28, Mr. Fiegel. He is part of this Jury."

The jury was selected and defendant proceeded to trial. Harris testified at trial, pursuant to a federal plea agreement, and he identified defendant with absolute certainty as the shooter. Smothers denied he had ever identified defendant. His testimony was contradicted by that of two FBI agents who testified he

---

[2] We note that an objection pursuant to *Batson* does not become moot when the stricken jurors leave the courthouse, and the absence of a juror does not obviate the need for a ruling on the objection. Generally, a *Batson* violation "is remediable in any one of a number of ways" only one of which is reseating a stricken juror. *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir. 1996) (finding that "[c]hallenges found to be abusive may be disallowed; if this is not feasible because the challenged jurors have already been released, additional jurors might be called to the venire and additional challenges granted to the defendant; or in cases where those remedies are insufficient, the jury selection might begin anew with a fresh panel").

identified defendant but his statements to them were never recorded or transcribed. Multiple DNA profiles were obtained from the outside of the assault rifle recovered on December 2, 2011, including DNA matching the defendant. Defendant's DNA was not consistent with the mixed DNA profiles obtained from the assault rifle's magazine. Ballistics testing showed that the assault rifle recovered on December 2, 2011, was used in the shooting on November 22, 2011.

The jury found defendant guilty as charged of two counts of attempted second degree murder and one count of being a felon in possession of a firearm. Defendant admitted his status as a second-felony offender (with a prior conviction in Texas for possession of cocaine), and the district court sentenced him to two concurrent terms of 100 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, and one concurrent term of 20 years imprisonment at hard labor.

The court of appeal affirmed after examining and rejecting several assignments of error. *State v. Jones*, 15-0956 (La. App. 4 Cir. 3/22/17), 214 So.3d 124. We granted defendant's application primarily to examine the district court's handling of the *Batson* and reverse-*Batson* objections. Pertinent to those issues, the court of appeal interpreted the district court's statement that "per se, it is not satisfied" as a determination that the defense had failed to make a prima facie showing of racial discrimination in the State's use of its peremptory challenges. *Jones*, 15-0956, pp. 12–13, 214 So.3d at 136–137. While recognizing ambiguity in the district court's initial request for a response from the State, the court of appeal found it did not constitute a demand for race-neutral reasons such that the burden ever shifted to the State to articulate those reasons. *Jones*, 15-0956, p. 13, 214 So.3d at 136 ("And, we are not convinced that the trial judge's request for a

4

response from the prosecutor, while perhaps not keeping within the confines of a *Batson* analysis, constituted a demand for race-neutral reasons such that the burden would shift to the state.").

In contrast, the court of appeal found the district court's statement that "the State has satisfied that first level" as indicating the State made a prima facie showing in conjunction with its reverse-*Batson* objection to defendant's use of peremptory challenges. *Jones*, 15-0956, p. 13, 214 So.3d at 137. With regard to *Batson*'s step two, the court of appeal also found the reasons provided by the defense for striking juror Fiegel were facially race-neutral because discriminatory intent was not inherent in them. *Id.* The court of appeal then inferred from the district court's statement that it was not satisfied, despite the district court's failure to adhere to the "precise mechanics" of *Batson*, that the district court correctly held the State to its burden of showing purposeful discrimination:

> The trial judge's succinct statement that she was "not satisfied" with defense counsel's reasons may appear to have impermissibly shifted the burden onto the defense to rebut the prosecutor's prima facie case. We are convinced, however, that the trial judge "assess[ed] the plausibility of [the defense's] reason in light of all [the] evidence," and, in essence, determined that the prosecution had carried its burden. *Miller–El*, 545 U.S. at 251–52, 125 S.Ct. 2317. Although the trial judge may not have adhered to the precise mechanics of a *Batson* analysis, we find that her ultimate ruling, which seated Juror Fiegel, did not render the jury unqualified or biased. We thus cannot say, based on the record before us, that the circumstances presented here warrant automatic reversal of Mr. Jones's convictions. *See Rivera*, 556 U.S. at 160, 129 S.Ct. 1446 (An error is "structural," therefore requiring automatic reversal "only when the error necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.") (internal quotation marks and brackets omitted).

*Jones*, 15-0956, p. 14, 214 So.3d at 137 (footnote omitted). That inference from scant evidence is where we find the court of appeal erred.

The United States Supreme Court in *Batson* and the cases that followed has

provided a three-step process to guide courts in evaluating a claim of racial discrimination in jury selection:

(1) An opponent of the strike must make a prima facie showing that a peremptory challenge has been exercised on the basis of race;

(2) if the requisite showing has been made, the proponent of the strike "must demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result;'" and

(3) in light of the parties' submissions, the trial court must determine if the "[the opponent of the strike] has established purposeful discrimination."

*State v. Green*, 94-0887, p. 23 (La. 5/22/95), 655 So.2d 272, 287 (quoting *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). The burden of persuasion never shifts from the opponent of the strike. *State v. Nelson*, 10-1724, 10-1726, p. 15 (La. 3/13/12), 85 So.3d 21, 32 (citing *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). However, after the opponent of the strike establishes a prima facie case of racial discrimination, the burden of production shifts to the proponent of the strike to articulate race-neutral reasons for its use of peremptory challenges. *See, e.g.*, *State v. Bender*, 13-1794, pp. 3–4 (La. 9/3/14), 152 So.3d 126, 129; *Nelson*, 10-1724, 10–1726, p. 10, 85 So.3d at 29; *State v. Draughn*, 05-1825, p. 29 (La. 1/17/07), 950 So.2d 583, 605; *Green*, 94-0887, p. 25, 655 So.2d at 288.

Not until steps one and two of the *Batson* test have been satisfied is the trial court's duty under step three triggered. *See Johnson v. California*, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005), which provides:

The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. "It is not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has

6

carried his burden of proving purposeful discrimination."

*Id.*, 545 U.S. at 171, 125 S.Ct. at 2417–18 (quoting *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771). Thus, the responsibility in the three-step *Batson* test falls first on the opponent of the strike in step one, then on the proponent of the strike in step two, and lastly, on the trial court in step three. The *Johnson* court elaborated on the critical importance of this tripartite framework:

> The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question. . . . The three-step process thus simultaneously serves the public purposes *Batson* is designed to vindicate and encourages prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process.

*Johnson*, 545 U.S. at 172, 125 S.Ct. at 2419 (citations and quotations omitted). This three-part process affords "the trial judge . . . the benefit of all relevant circumstances, including the [proponent of the strike's] explanation, before deciding whether it was more likely than not that the challenge was improperly motivated." *Id.*, 545 U.S. at 170, 125 S.Ct. at 2417.

The court of appeal here recognized that the district court's adherence to the three-step *Batson* framework was lacking in several respects. But adherence to the "precise mechanics" of a *Batson* analysis, as the court of appeal described it, is not only important so that the *Batson* framework can produce actual answers and ferret out any discrimination that infects the jury selection process. It is also important to adhere to that framework and articulate clear rulings at each step of the *Batson* procedure so that a defendant can exercise his constitutional right to appellate

7

review provided in La. Const. Art. I, § 19.[3]

In step three of the *Batson* analysis, the court must determine whether the objecting party has carried his burden of proving purposeful discrimination. *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 2331–32, 162 L.Ed.2d 196 (2005); *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. This final step involves evaluating "the persuasiveness of the justification" proffered by the striking party, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771.

In *Purkett*, the Supreme Court warned against "combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive." *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771. Instead, the Court noted "[i]t is not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.* The Court explained that blurring the *Batson* stages can impermissibly shift the burden onto the proponent of the strike:

> But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step three is quite different from saying that a trial judge must terminate the inquiry at step two when the race-

[3] As the United States Supreme Court recently noted,

> [W]ho enforces *Batson*? As the *Batson* Court itself recognized, the job of enforcing *Batson* rests first and foremost with trial judges. *See id.*, at 97, 99, n. 22, 106 S.Ct. 1712. America's trial judges operate at the front lines of American justice. In criminal trials, trial judges possess the primary responsibility to enforce *Batson* and prevent racial discrimination from seeping into the jury selection process.

*Flowers v. Mississippi*, 588 U.S. —, —, 139 S.Ct. 2228, 2243, 204 L.Ed.2d 638 (2019). *See also State v. Hoff*, 19-0475 (La. 6/26/19), 275 So.3d 871 (Crichton, J., concurring, on the importance of "articulating well-considered rulings such that a record is perfected for possible appellate review") (and concurrences cited therein).

neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Id.* Thus, the proper inquiry in the final stage of the *Batson* analysis is not whether the proponent of the strike has disproved the existence of purposeful discrimination suggested by the opponent's prima facie case. Rather, the question is whether the opponent's proof, when weighed against the proponent's proffered race-neutral reasons, is strong enough to persuade the district court that such discriminatory intent is present. Any other approach "violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771.

From the district court's lone statement that it was not satisfied with defendant's proffered race-neutral reasons, we find it inappropriate to infer that the district court did not blur the line between *Batson*'s second and third steps, that the district court was persuaded after it properly weighed the State's proof against the defendant's proffered race-neutral reasons, and that the court did not impermissibly shift the burden onto the defense to rebut the State's prima facie case. *See State v. Harris*, 15-0995 (La. 10/1916), 217 So.3d 255; *State v. Nelson*, 10-1724 (La. 3/13/12), 85 So.3d 21; *State v. Green*, 94-0887 (La. 5/22/95), 655 So.2d 272. Accordingly, we reverse the court of appeal, vacate the convictions and sentences, and remand the case to the district court for a new trial.

In the course of reviewing the record, it also became clear that the State relied extensively in this trial on evidence of other crimes alleged to have been committed by defendant. In fact, the majority of the witnesses to testify and the bulk of the evidence presented related not to the charged offenses but to four other shootings for which defendant was never arrested or charged.

9

Generally, courts may not admit evidence of other crimes to show the defendant a person of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); *State v. Prieur*, 277 So.2d 126 (La. 1973). However, the state may introduce evidence of other crimes if the State establishes an independent and relevant reason. La. C.E. art. 404(B)(1). This evidence must have substantial relevance independent from showing defendant's general criminal character in that it tends to prove a material fact genuinely at issue. *State v. Lee*, 05-2098, p. 44 (La. 1/16/08), 976 So.2d 109, 139; *State v. Moore*, 440 So.2d 134, 137 (La. 1983). The probative value of the other crimes evidence must outweigh the danger of unfair prejudice. La. C.E. art. 403.

As noted above, four other shootings were the subject of extensive attention in this trial. On May 24, 2011, there was a shooting at Sam Bonart Park. Shell casings found there matched the same style of assault rifle as that used in the November 22, 2011 shooting.[4] An FBI agent testified that an informant later told him that defendant was the shooter at Sam Bonart Park. The informant denied this at defendant's trial. On May 27, 2011, there was a shooting in the Lower Ninth Ward. The victim was not cooperative and would not identify the shooter. Shell casings from an assault rifle were found there. Later, when an informant was arrested for distributing heroin, the informant identified defendant as the shooter in the Lower Ninth Ward incident. That identification was established at this trial through the testimony of an FBI agent after it was denied by the informant. On September 5, 2011, Merlin Smothers was shot several times. Shell casings from an

---

[4] Pretrial, the State took the position that this shooting was unreported, uninvestigated, and undocumented. By the time of trial, however, the State called NOPD officers to testify they responded to a report of the shooting and collected shell casings. Whether this amounted to a discovery violation or is indicative of prosecutorial misconduct is beyond the scope of the present opinion.

assault rifle were found at the scene. He said the shooter drove a blue Monte Carlo but did not provide any other information about the shooter. Later, after he was arrested on federal charges, he identified the shooter as defendant. Again, that identification was established at this trial by the testimony of FBI agents after Smothers denied it. Finally, on November 29, 2011, several persons fired shots from a white Dodge truck into the Mercedes Place bar. Ballistics evidence linked this shooting to the assault rifle recovered on December 2, 2011. An FBI agent testified Smothers identified defendant as one of the shooters in the Mercedes Place incident after Smothers denied this.

Notably, defendant was never developed as a suspect in any of these shootings until years later when informants, who faced federal charges, implicated him. The informants' statements were unrecorded, untranscribed, and otherwise undocumented. The informants all denied ever making these statements and therefore the statements were proved by the testimony of the FBI agents to whom they were made, which leads to an evidentiary conundrum. At first blush, that testimony might appear to constitute hearsay, given that it was relayed in court by persons other than the declarants and was offered to prove the truth of the matter asserted, i.e., that defendant was the shooter or among the shooters in each incident.[5]

---

[5] We recognize, of course, that it is possible that some of these statements could qualify as non-hearsay under La. C.E. art. 801(D)(1)(a) and (c), but only if they are used in the context of a relevant line of inquiry. While the State filed notice of intent to introduce other crimes evidence with respect to these prior shootings, arguing that they would be relevant to defendant's "intent, motive, preparation, plan, identity, and opportunity," we caution, as we did in *State v. Taylor*, 16-1124 (La. 12/1/16), 217 So.3d 283, against the reliance on boilerplate language in this area. Instead, we urge the district court on remand to carefully consider on an individual basis the relevancy of each piece of other crimes evidence the State may seek to introduce. *See Taylor*, 16-1124, p. 12, 217 So.3d at 292 ("Accordingly, the state cannot simply rely on a boilerplate recitation of the grounds for admissibility stated in La. C.E. art. 404(B). It is the duty of the district court in its gatekeeping function to determine the independent relevancy of this

The State, however, argued that because the informants testified and disavowed their statements, the agents could be called to testify about those prior inconsistent statements to impeach their credibility in accordance with La. C.E. art. 613.[6] Given the limited scope of the informants' testimony, however, impeaching their credibility would appear simply to permit the inference that they made the prior undocumented statements they denied, which then would permit the statements to be used not just to impeach the informants' credibility but as evidence that the defendant committed the shootings. Even the best instructed jury could have been confused by this circular and bootstrapping approach to evidence. However, we need not resolve this evidentiary conundrum today. We simply urge the district court to proceed with extreme caution on retrial if the State again tries to rely so heavily on undocumented statements that have been disavowed by the purported informants.

Finally, the extensive focus on other crimes evidence may have at least tempted the jury to infer defendant is a person of bad character who has acted in conformity with his bad character. Whether the probative value of the other crimes evidence, particularly given the manner in which the State sought to prove it, outweighed the danger of unfair prejudice,[7] we need not decide today. But we urge

---

evidence.").

[6] Code of Evidence article 613 provides:

> Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.

[7] The term "unfair prejudice" with regard to a criminal defendant speaks to the capacity of the evidence to lure the factfinder into declaring guilty on a ground different from proof specific to the offense charged. *See, e.g., State v. Henderson*, 12-2422, p. 2 (La. 1/4/13), 107 So.3d 566, 568, citing *Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574

12

the district court to be mindful of that balancing test on remand.

In sum, we encourage the district court to consider carefully on retrial: (1) whether the State can present sufficient competent evidence at trial that defendant engaged in the alleged other crimes; (2) whether the other crimes evidence, considered on an individual basis, has an independent relevance outside of its implications for defendant's character; (3) whether the admission of the State's other crimes evidence comports with the rules governing hearsay; and (4) whether the probative value of the State's other crimes evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time" in accordance with La. C.E. art. 403.

**REVERSED AND REMANDED**

---

(1997).

SUPREME COURT OF LOUISIANA

No. 2017-K-00658

STATE OF LOUISIANA

VS.

KENNETH JONES

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ORLEANS

**JOHNSON, C.J.**, additionally concurs and assigns reasons.

I agree with the majority that a *Batson* violation occurred in this case and defendant's conviction must be reversed. I write separately to expound upon the majority's discussion on the issue of other crimes evidence. In my view, the district court erred in admitting extensive other crimes evidence and defendant's conviction could have also been reversed on that issue.

In this case, voluminous, highly prejudicial hearsay testimony implicating defendant in gang activity and multiple shootings for which he was never charged was improperly allowed to be presented to the jury. Generally, courts may not admit evidence of other crimes to show the defendant a person of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1); *State v. Prieur*, 277 So. 2d 126 (La. 1973). However, the state may introduce evidence of other crimes if the state establishes an independent and relevant reason. La. C.E. art. 404(B)(1). This evidence must have substantial relevance independent from showing defendant's general criminal character in that it tends to prove a material fact genuinely at issue. *State v. Lee*, 05-2098 (La. 1/16/08), 976 So. 2d 109, 139; *State v. Moore*, 440 So. 2d 134, 137 (La. 1983).

1

In *State v. Taylor*, 16-1124 (La. 12/1/16), 217 So. 3d 283, this court clarified the procedure to introduce other crimes evidence per La. C.E. art. 404(B)(1) and *Prieur*. When the state seeks to introduce other crimes evidence, it is required to provide the defendant with written notice prior to trial of the intent to produce such evidence, and the trial court must conduct a pretrial hearing to determine the admissibility of the evidence. At the hearing, "[t]he state need only make a showing of *sufficient* evidence to support a finding that the defendant committed the other crime, wrong, or act." *Taylor*, 217 So. 3d at 291. A district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. *Id.* at 296.

Here, the state was allowed to present testimony about four prior offenses for which defendant was never arrested, charged or convicted: (1) an illegal discharge of a weapon that occurred on May 23, 2011, at Sam Bonart Park; (2) the shooting of Corey Celestine on May 27, 2011; (3) the shooting of Merlin Smothers on September 5, 2011; and (4) and illegal discharge of a weapon on November 29, 2011, at Mercedes Bar in New Orleans. However, the record clearly demonstrates the state failed to present sufficient evidence that defendant actually committed the four prior offenses. At the *Prieur* hearing, the state's sole witness was FBI Agent Christopher Dimenna. In affirming the trial court's *Prieur* ruling, the court of appeal reasoned:

> At the pre-trial hearing, FBI Agent Christopher DiMenna testified that in the course of the Ninth Ward Initiative investigation, Mr. Jones had been developed as a suspect in the four other incidents, as well as the instant incident. Agent DiMenna testified in detail about the multiple witnesses who identified Mr. Jones as the shooter in each incident. He further testified about how police recovered the discarded AK-47 and that forensic and ballistic testing linked the gun to the defendant and two of the crime scenes, respectively.
>
> We first find that, under *Taylor*, the prosecution carried its burden with a "showing of sufficient evidence to support a finding" that Mr. Jones committed the other acts. Agent DiMenna

2

> testified that he and his team conducted investigations into each of these shootings and that either he or his colleagues obtained statements from witnesses who identified Mr. Jones as the shooter. Although the defendant complains that Agent DiMenna's testimony was hearsay, it is well-established that hearsay is admissible in a pre-trial hearing on the admissibility of other crimes.

*State v. Jones*, 15-0956 (La. App. 4 Cir. 3/22/17), 214 So. 3d 124, 141, *writ granted*, 17-0658 (La. 3/25/19), - So.3d -. (internal citations removed). However, I find the court of appeal's description of the evidence to be erroneous.

A review of the hearing transcript reflects Agent DiMenna explicitly testified that defendant was *not* developed as a suspect in any of the four shootings, and that neither he nor his colleagues investigated the shootings or defendant's alleged role in them, because too much time had elapsed. Instead, Agent DiMenna testified that years after the incidents in question, his unspecified colleagues in the FBI arrested unidentified individuals on federal charges, and these unidentified individuals implicated defendant during unrecorded and untranscribed interviews. Rather than testifying about "multiple witnesses who identified defendant as the shooter in each incident," Agent DiMenna actually testified that a single unidentified informant implicated defendant in the shootings on May 27, 2011 and September 5, 2011.

Further, Agent DiMenna testified that no witnesses ever reported that they saw defendant commit the alleged shooting on May 24, 2011, at Sam Bonart Park or the November 29, 2011, shooting at Mercedes Bar. In fact, Agent DiMenna testified that to his knowledge the Sam Bonart Park shooting was never even reported, which the prosecutor also asserted to the district court and defense at the outset of the hearing. Although an informant allegedly told an FBI Agent that he had hired defendant to seek revenge on an enemy at the park that day, neither the informant nor any other witnesses

3

reported having observed defendant (or anyone else) doing so, and no police reports documented that a shooting had taken place.

Regarding the shooting which took place on November 29, 2011, at Mercedes Bar, Agent DiMenna testified that no witnesses had implicated defendant. However, multiple witnesses identified a man named Wayne Handy as one of two shooters in the back of a white pickup truck, and Handy and two other men had been convicted of the offense. Agent DiMenna confirmed on cross-examination that Jeremiah Harris, a victim in the charged offense, verified that they had convicted the correct people for that shooting. Yet, Agent DiMenna's testimony bootstrapped a speculative chain of evidence to connect defendant to the shooting. Ballistics linked a rifle used in that shooting with the one used in the charged offense. On December 2, 2011, NOPD had found the rifle discarded by a person in a white truck, and defendant's DNA was consistent with one of the many DNA profiles collected from the outside of the rifle, but his DNA was not consistent with the mixed profiles collected from the rifle's magazine. At best, the evidence presented at the hearing was sufficient to support a finding that defendant was one of several people who had handled the rifle before it was discarded.

It is clear to me the evidence presented at the *Prieur* hearing was not sufficient to support a finding that defendant committed these crimes, and admitting evidence of these incidents was an abuse of the district court's discretion.

Additionally, after the *Prieur* hearing but before trial, the state submitted notice that the informants in the May 27, 2011, and September 5, 2011, incidents had denied ever implicating defendant in those shootings, and denied knowledge of his involvement. Consequently, because their alleged statements were neither recorded, written, transcribed, nor otherwise verified by the witnesses, the state no longer had any admissible evidence of

4

defendant's involvement in the incidents. Defendant moved to reopen the *Prieur* hearing and for reconsideration of the court's earlier ruling admitting the other crimes evidence. The defense argued that the court should exclude the other crimes evidence in light of the state's disclosure that the witnesses denied making the unrecorded statements described by Agent DiMenna in his testimony at the *Prieur* hearing. The defense argued that, consequently, law enforcement testimony suggesting defendant's involvement would be hearsay and a violation of defendant's confrontation rights. The prosecutor responded that he intended to call the alleged witnesses and then impeach them with testimony from the FBI agents when the witnesses denied their statements. The district court ruled that it would "allow the impeachment testimony to take place throughout the course of the trial."

This ruling was clearly erroneous because the extensive law enforcement testimony was not introduced to impeach the general credibility of the witnesses, but rather to prove the truth of the matter asserted—that defendant had committed the alleged other crimes. This hearsay was the only evidence introduced to prove that defendant had committed the alleged other crimes. Moreover, although the state and courts below refer to the witnesses as having "recanted their statements," this wording presupposes they actually made statements that they later disavowed; here, the witnesses are not disavowing their own statements, they are disavowing the FBI's self-affirming hearsay testimony.

Finally, even if this evidence was admissible, there is no question the probative value of the other crimes evidence was greatly outweighed by its prejudicial impact. La. C.E. art. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." Unfair prejudice speaks

to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged. *State v. Rose*, 06-0402 (La. 2/22/07), 949 So. 2d 1236, 1244 (internal citations removed). During defendant's trial, the state called twenty witnesses, with only four having direct knowledge of the offense charged. The state first called six witnesses who testified about other crimes evidence, followed by the four witnesses with alleged knowledge of the offense charged. The state then called an additional ten witnesses to testify about other crimes evidence. In my view, the barrage of other crimes evidence in comparison to the minimal evidence relative to the crime charged, was clearly intended to overwhelm the jury and lure them into finding defendant guilty because he is a bad person, rather than based on direct evidence of guilt.

For the above reasons, I find the district court erred in admitting the other crimes evidence, and defendant's conviction is properly reversed on this issue.

SUPREME COURT OF LOUISIANA

No. 2017-K-0658

STATE OF LOUISIANA

versus

KENNETH JONES

*ON WRIT OF CERTIORARI TO THE FOURTH CIRCUIT
COURT OF APPEAL, PARISH OF ORLEANS*

**WEIMER, J.**, concurring in part, dissenting in part.

I respectfully dissent from the majority's analysis, under **Batson v. Kentucky**, 476 U.S. 79 (1986), and its progeny, of the defense's use of a peremptory challenge to strike a prospective juror during *voir dire*. The majority correctly sets forth the test for impermissible discrimination in *voir dire*, but does not accord sufficient deference to the trial court's finding of discriminatory intent. See **Snyder v. Louisiana**, 552 U.S. 472, 477 (2008).

It is certainly accurate that the test for impermissible discrimination in *voir dire* has three analytical steps. In summary, a trial court first ascertains whether the objector has described factual support for a finding of discrimination; second, the court asks the opposing party for any race-neutral justification for striking the juror(s); and third, the court evaluates both parties' positions and determines whether the objector has proven discrimination. See **State v. Green**, 94-0887, p. 23 (La. 5/22/95), 655 So.2d 272, 287 (quoting **Hernandez v. New York**, 500 U.S. 352, 358-59 (1991)).

In recognition of the vast discretion afforded to trial courts in carrying out their duties, the jurisprudence does not require a trial court to intone the equivalent of an incantation to signal that the trial court has undertaken each step. As the

Supreme Court explained in **Miller-El v. Cockrell**, 537 U.S. 322, 347 (2003),[1] when ruling on a **Batson** claim, "[w]e adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it." In a similar vein, in **Purkett v. Elem**, 514 U.S. 765 (1995) (on which the majority relies for other propositions), the Supreme Court explained that when a trial court considers a **Batson** claim, the circumstances may dictate at the third step that the trial court refer back to the second step. That is, a trial court's third step ruling may consist of rejecting—as the trial court did here—a party's stated justification for striking a juror: "It is not until the third step that the persuasiveness of the justification becomes relevant …. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." **Purkett**, 514 U.S. at 768.

Here, when defense counsel was asked for a justification for striking Juror No. 28, Mr. Fiegel, defense counsel stated: "I struck him because he wasn't very talkative." As contemplated by **Purkett**, the trial court here rejected the defense's explanation for striking Mr. Fiegel and empaneled Mr. Fiegel on the petit jury, stating that the trial court was "not satisfied with [the defense's] response as to Mr. Fiegel."

The trial court's ruling was not made in a vacuum, devoid of supporting facts and credibility concerns. The ruling came after defense counsel struck a total of ten white jurors, and defense counsel earlier failed to persuade the trial court that the prosecution was attempting to skew the jury's composition along racial lines.

The Supreme Court has indicated that "the critical question" for a trial court when evaluating the overall persuasiveness of an objection to a strike "at step three…

---

[1] For clarity, it should be noted that an opinion briefly mentioned by the majority, **Miller-El v. Dretke**, 545 U.S. 231 (2005), is the later review of the same criminal conviction at issue in **Miller-El v. Cockrell**, 537 U.S. 322 (2003). In the earlier opinion, cited herein, the Supreme Court articulated and explained many of the legal principles the Court would later apply in **Miller-El v. Dretke**, 545 U.S. 231.

is the persuasiveness of [counsel's] justification for his peremptory strike." **Miller-El**, 537 U.S. at 338-39. Counsel's "[c]redibility can be measured by, among other factors, [counsel's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." A reviewing court owes the trial court's credibility determination "[d]eference … because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Id.*

The trial court's determination here to reject counsel's explanation that Mr. Fiegel "wasn't very talkative" was a reasonable determination. There is no indication that the state failed to carry its burden of persuading the trial court that Mr. Fiegel should be placed on the jury. Indeed, given the record of defense counsel's use of strikes, and in light of the acknowledgment in **Miller-El** that a trial court may evaluate many subtleties regarding an attorney's use of strikes that a transcribed record simply cannot capture, I find the trial court's decision was not clearly erroneous and should therefore remain undisturbed. See **Snyder**, 552 U.S. at 477 ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.").

The **Batson** test is concerned with the mindset of a party when striking a juror. However, the majority's ruling underserves this concern, because it essentially insists the trial court use "magic words" in its analysis or adhere to other formalities not required by **Batson** or its progeny. No doubt, the majority's ruling finds some justification in the well-intentioned desire for clarity in future cases. However, I find the majority's approach over-emphasizes the trial judge's word choices, to the detriment of the required inquiry into whether a racial motivation underlies counsel's choices regarding who should sit in the jury box.

Thus, I respectfully dissent from the majority's *voir dire* ruling. I concur with

3

the majority's statements regarding the other crimes evidence and concur in the ultimate ruling that reverses the conviction and remands this matter for further proceedings.

SUPREME COURT OF LOUISIANA

No. 2017-K-00658

STATE OF LOUISIANA

VS.

KENNETH JONES

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ORLEANS

**CRICHTON, J., dissents and assigns reasons:**

I strongly dissent from the majority's decision on the *Batson* issue for the reasons set forth by Justice Weimer.

I write separately to note that any discussion of the other crimes evidence by the majority, albeit in *dicta*, is inappropriate, because the Court's decision on the *Batson* issue mandates reversal. However, since the majority delves into the other crimes evidence, I further note that, while the other crimes evidence in this case was extensive, I do not find its introduction amounts to reversible error for several reasons. First, this gang warfare trial was replete with uncooperative witnesses changing their statements and demonstrating hostility to the prosecution, thereby necessitating introduction of prior inconsistent statements in accordance with C.E. art. 613. Evidence of gang affiliation has been held admissible as it is relevant to show intent, motive, and identity. *See State v. Howard*, 98-0064 (La. 4/23/99), 751 So. 2d 783, 812. To that end, given the specific intent element of attempted second degree murder, the necessity of proving intent, motive, preparation, plan, identity and opportunity under C.E. 404(B)(1) dictated admission of these crimes.

Second, erroneous introduction of other crimes evidence (and even allowing extensive and perhaps conflicting other crimes evidence) is subject to a harmless

error analysis. *See State v. Johnson*, 94-1379 (La. 11/27/95), 664 So.2d 94, *rehearing denied*, 1/12/96. The jury was able to weigh and balance the other crimes evidence in light of victim Harris' positive identification of defendant as the shooter (stating he was "one hundred percent sure" the shooter as defendant), the DNA and ballistics evidence, and the testimony of the FBI agents as to the prior statement of victim Smothers.

Finally, the record reflects that the accomplished trial judge properly instructed the jury as to the limited purpose of other crimes evidence, instructing that the evidence is to be "considered only for a limited purpose" as to "whether it tends to establish proof of a motive, opportunity, intent, preparation, a system or plan, knowledge, identify, absence of mistake or accident" and that the defendant was on trial "only for the offenses charged." In my view, it is error for the majority to leap to a conclusion—albeit in *dicta*—that the jury was unable to understand the instruction or was "confused by this circular and bootstrapping approach to evidence." There is simply no basis to conclude inability to apply the limiting instruction. As a result, I do not find the admission of other crimes evidence amounts to reversible error in this case.

Accordingly, I would find no *Batson /* reverse-*Batson* structural error and would deem the admonition by the majority unwarranted.

**SUPREME COURT OF LOUISIANA**

**NO. 2017-K-00658**

**STATE OF LOUISIANA**

**VERSUS**

**KENNETH JONES**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FOURTH CIRCUIT, PARISH OF ORLEANS**

**CHEHARDY, J.**, dissents for the reasons assigned by Justice Crichton.